UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

KEVIN KRUPPENBACHER,                        :

               Plaintiff,    :

   -against-                                :

MICHAEL J. ASTRUE,                          :
Commissioner of Social Security,
                        :

             Defendant.    :
----------------------------------X

04 Civ. 4150 (WHP)(HBP)

REPORT AND
RECOMMENDATION


       PITMAN, United States Magistrate Judge:


       TO THE HONORABLE WILLIAM H. PAULEY, III, United States

District Judge,


I.  Introduction


       Plaintiff, Kevin Kruppenbacher, brings this action

pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB").  Both

plaintiff and defendant have moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure

(Docket Items 18 and 22).  For the reasons set forth below, I

respectfully recommend that judgment on the pleadings be granted

in favor of defendant.

II.  Facts

A.  Procedural Background

Plaintiff filed an application for DIB on April 17, 1997, alleging that he had been disabled since December 31, 1994[1] due to Meniere's disease[2] (Tr.[3] 11, 12, 24, 26, 82; see Tr. 62). Since he his initial application, he has also alleged disability due to depression, anxiety, Post-Traumatic Stress Disorder ("PTSD"), personality disorder and a cognitive disorder (Tr. 124, 126, 240; Plaintiff's Brief in Support of Cross-Motion for Judgment on the Pleadings ("Pl.'s Mem. in Support") at 26-28). The Social Security Administration denied plaintiff's application for benefits on September 10, 1997, finding that he was not disabled through December 31, 1994, the date on which he was last

---

[1]Although plaintiff states in other parts of his application that he became disabled on April 1, 1997 and September 1, 1995 (Tr. 72, 82), December 31, 1994 is the only alleged onset date on which plaintiff still met the requirements for insured status (see Tr. 45, 46, 77, 118, 410).

[2]Meniere's disease is an inner-ear condition "characterized clinically by vertigo, nausea, vomiting, tinnitus, and progressive hearing loss due to hydrops of the lymphatic duct." Stedman's Medical Dictionary (27th ed. 2000); see Dorland's Illustrated Medical Dictionary, 546 (31st ed. 2007); Odierno v. Bowen, 655 F. Supp. 173, 176 n.1 (S.D.N.Y. 1987) (Ward, D.J.).

[3]"Tr." refers to the administrative record that defendant filed as part of his answer, as required by 42 U.S.C. § 405(g).

insured for DIB[4] (Tr. 45, 46, 48, 51).  The denial was affirmed on reconsideration on October 20, 1997 (Tr. 46, 54, 56).  Plaintiff timely requested (Tr. 57) and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 17).  ALJ Joseph F. Gibbons conducted a hearing on April 2, 1998 at which plaintiff was represented by attorney Ronald White (Tr. 11, 17, 22, 24, 58).  In a decision dated May 6, 1998, ALJ Gibbons found that plaintiff was not disabled through December 31, 1994, and was not, therefore, entitled to benefits (Tr. 8-15).  ALJ Gibbons' decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 2, 1999 (Tr. 3-4).  Plaintiff filed a complaint challenging this decision on June 1, 1999.  The parties cross-moved for judgment on the pleadings, and on September 20, 2000, the case was remanded to the Commissioner for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) (Tr. 297-99; see Tr. 319-20).  On January 23, 2001, the Appeals Council in turn remanded to an ALJ for further proceedings including an evidentiary hearing (Tr. 224, 321-22).

---

[4]To be eligible for DIB, a claimant must have worked for at least 20 of the 40 calendar quarters preceding the onset of disability.  See 42 U.S.C. § 423(c)(1); Perez v. Chater, 77 F.3d 41, 43 n.2 (2d Cir. 1996).  It is undisputed that December 31, 1994 was the last date on which plaintiff satisfied this requirement (see Pl.'s Mem. in Support at 3, 29-31; Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Def.'s Mem. in Support") at 1; see also Tr. 45, 46, 48, 51, 77, 118, 410).

On remand, the case was reassigned to ALJ Thomas P. Zolezzi, who conducted supplemental hearings on March 16, 2001 and July 18, 2001 (Tr. 224, 234, 277; see Tr. 331, 402).  Plaintiff was represented by attorney Irwin Portnoy at both hearings (Tr. 224, 277; see Tr. 338).  ALJ Zolezzi also collected additional evidence (Tr. 224).  In a decision issued on December 28, 2001, he found that plaintiff was not disabled on or before December 31, 1994 (Tr. 221, 224-33).  Plaintiff submitted written exceptions to the decision (Tr. 181-92, 195-99).  On April 1, 2004, the Appeals Council denied plaintiff's exceptions and declined to assume jurisdiction over the case (Tr. 177-78).

Plaintiff filed a complaint challenging this decision on June 2, 2004.  On October 25, 2004, the Court "so ordered" the parties' stipulation remanding the case back to the Commissioner pursuant to the 6th sentence of 42 U.S.C. 205(g) for further administrative proceedings (Tr. 579-80).  On March 25, 2005, the Appeals Council vacated the prior final decision of the Commissioner and remanded the case to an ALJ[5] (Tr. 581-82).  The case

---

[5]The Appeals Council's order remanding the case noted that Dr. Jose Fontanez's retrospective diagnosis of plaintiff lacked support from any contemporaneous medical records and was contradicted by plaintiff's statements, and directed that the new ALJ:  (1) further consider plaintiff's maximum residual functional capacity with specific reference to evidence in the record, (2) further consider the opinions of treating and examining sources and explain the weight given to such opinions and (3) solicit evidence from a medical expert on plaintiff's residual functional capacity during the period at issue (Tr. 581-
(continued...)

was reassigned to ALJ Terence Farrell, who held supplemental
hearings on April 24, 2006, August 10, 2006 and January 22, 2007
(Tr. 633, 667, 686, 710, 901-03, 949-51, 982-84).  On April 27,
2007 the ALJ issued a decision, again denying plaintiff's claim
(Tr. 630-48).  Plaintiff, through his representative, filed
exceptions to the decision (Tr. 593-625, 628).  On October 13,
2007, the Appeals Council denied plaintiff's exceptions and
declined to assume jurisdiction over the case (Tr. 590-91).

On November 26, 2007, plaintiff amended his previous
complaint to challenge the Commissioner's latest unfavorable
decision.  Plaintiff's case was reopened on December 17, 2007
(Order issued by the Honorable William H. Pauley III on December
17, 2007, Docket Item 13).  On March 24, 2008, defendant moved
for judgment on the pleadings under Rule 12(c) of the Federal
Rules of Civil Procedure (Docket Item 18).  On April 28, 2008,
plaintiff cross-moved for judgment on the pleadings (Docket Item
22).

Defendant argues that the Commissioner's decision
finding plaintiff not disabled was supported by substantial
evidence and that ALJ Farrell evaluated the evidence using the
correct legal standards (Def.'s Mem. in Support at 17; Memorandum
of Law in Opposition to Plaintiff's Cross-Motion for Judgment on

---

[5](...continued)
82).

the Pleadings and in Further Support of Defendant's Motion for
Judgment on the Pleadings ("Def.'s Reply Mem.") at 1).  Defendant
emphasizes that plaintiff never sought medical treatment for
Meniere's disease or his anxiety until over a year and a half
after his date last insured, that he reported to a doctor in
August 1995 that the dizziness he experienced had occurred two
weeks earlier and lasted only a week, and that the record con-
tains no documentation of Meniere's symptoms until 1996 (Def.'s
Mem. in Support at 1).

Plaintiff argues that the Commissioner's decision
should be overturned because (1) ALJ Farrell failed to consider
the aggregate effects of plaintiff's alleged impairments, (2) he
failed to follow the regulations governing the weight to be given
treating physicians' opinions, (3) his finding regarding a
potential cognitive impairment was based on "incorrect" evidence,
(4) he failed to assess plaintiff's capabilities "function by
function," (5) he evaluated plaintiff's credibility based on an
erroneous or incomplete view of the law and evidence and (6) he
improperly questioned the vocational witness (Pl.'s Mem. in
Support at 24-39).

B.  Plaintiff's Social
    Background

Plaintiff was born on April 4, 1963 and was thirty-one
years old when his insured status expired on December 31, 1994

(Tr. 26, 45, 62, 239, 988).  Plaintiff married his wife Margaret in 1984 (Tr. 538, <u>see</u> Tr. 37, 62) and has a son and a daughter who, at the time of the April 2, 1998 hearing, were twelve and eight years old respectively (Tr. 34).  As of April 2, 1998, plaintiff lived in a house in Poughkeepsie with his wife and two children (Tr. 32-33).  He stated at the April 2, 1998 hearing that he did not drive or do any shopping, cooking, cleaning or laundry (Tr. 33-35).  He reported that he did some minimal lawn care (Tr. 34, 41), but mostly spent his days on the couch with his eyes closed (Tr. 35).

Plaintiff was physically abused as a child by his alcoholic mother (Tr. 523, 811, 835).  As the result of several violent episodes, he spent about a year at the Berkshire Youth Program, a residential treatment center, when he was fourteen and fifteen (Tr. 522, 544, 840).  He then attended an alternative high school (Tr. 522, 544, 573).  He left school partway through the 12th grade and later obtained a G.E.D. (Tr. 26, 99, 240, 988).

Plaintiff's first employment was as a tire mechanic, and he also worked at various times as a building maintenance person, stock person, truck washer, van driver and building manager (Tr. 26, 104).  Plaintiff last worked in a formal posi- tion in 1990 or 1991 (Tr. 25, 40, 122).

In his most recent position as a building manager for Capelli Development, which he states he held from March 1988 to March 1991, plaintiff maintained and repaired the air conditioning units, refrigeration equipment, boilers, heat pumps, water pumps, toilets, ceiling tiles, lights, duct work and electrical systems, as well as performing painting work, for a four-story office complex (Tr. 104, 243, 988-89).  He handled tenant complaints and repair requests and oversaw a groundskeeping crew of two people (Tr. 105).  The job involved substantial walking and standing, as well as stooping and crouching, climbing, carrying items long distances, and lifting over 100 pounds -- and 50 pounds on a regular basis (Tr. 105, 107, 244).  In this job plaintiff used hammer drills, nail guns, high pressure washers, power saws, pressure gauges and power snakes (Tr. 106).  The job required him to drive to the local post office in the company car approximately once a week (Tr. 990).  The job also involved reading blueprints of the building, completing work orders, completing reports and keeping logs of preventative maintenance performed (Tr. 106).

In his position as night engineer at a 444 room hotel, which he held from May 1986 to January 1987, plaintiff was responsible for running the heating, cooling and ventilation units, repairing the laundry equipment and other housekeeping equipment and responding to guest complaints (Tr. 104, 108, 243).

8

The job involved a lot of walking, as well as bending, stooping, crouching, crawling, climbing, generally changing positions frequently, carrying items long distances, occasionally lifting up to 50 pounds and frequently lifting 25 pounds (Tr. 108-10, 243). The job involved use of a common drill, air compressor, electrical testers and basic hand tools (Tr. 109). Plaintiff was required to read blueprints as well as complete work orders and maintain a log of work performed (Tr. 109).

In his position as a truck washer for Fleet Wash, which he stated he held from January to May 1986, he drove a truck containing a large water tank and power washer to sites where fleets of trucks were stationed and washed the trucks (Tr. 104, 111, 242). The position involved walking and standing, stooping and crouching, lifting up to 100 pounds occasionally and lifting 25 or 30 pounds regularly, and using a gas-powered high-pressure washer (Tr. 111-13, 995).

Plaintiff also worked as a maintenance mechanic assisting the superintendent of a new condominium complex from October 1985 to January 1986 (Tr. 104, 114). In this position, he installed appliances, completed finishing work, cleaned construction debris and picked up construction materials (Tr. 104, 114). He also supervised three laborers, read blueprints, and used powersaws, table saws, drills and basic hand tools (Tr. 115). The job involved walking, standing, stooping and crouching,

climbing, lifting over 100 pounds occasionally and 25 pounds
frequently, and carrying items long distances (Tr. 114, 116).

Plaintiff also worked as a stock clerk at Guerlain
perfume factory for several months at some point in 1984 or 1985
(Tr. 104, 996; see Tr. 29).  In this job he packed boxes of
perfume, standing for twenty or thirty minutes at a time and then
sitting down to fill out paperwork, sitting for a total of about
two hours a day (Tr. 997).  The heaviest load plaintiff lifted at
this job was five pounds (Tr. 998).

Before this, plaintiff worked at Goodyear Tire and
Inter City Tire doing oil changes (Tr. 104, 991-92).  He testi-
fied that the job involved lifting tires which were around
twenty-five pounds (Tr. 996).

Plaintiff states that starting in 1991 he worked for
himself doing odd jobs such as yard work and home repair[6] (Tr.
29-30, 244-45, 544).  He last did any of this type of work in
spring 1995, when he helped put a roof on his neighbor's house, a
week-long job, for $300 (Tr. 29-31).  He stated that he took the
roofing job despite alleged frequent dizziness because of his
need to support his family and because he thought it would be

---

[6]Despite his statements that he did odd jobs between 1991
and 1995, plaintiff testified at the August 10, 2006 hearing
before ALJ Farrell that he did not perform any odd jobs or other
paid work after 1990 (Tr. 968).

easy (Tr. 41).  This was the only work he performed in 1995 (Tr. 40).

### C.  Plaintiff's Medical Background

#### 1.  Information Reported by Plaintiff

Plaintiff stated in his DIB application that his Meniere's disease involved the fluid of the inner ear, "cause[d] erratic unexpected attacks of vertigo [and] hearing loss" and interfered with his ability to function normally (Tr. 82).  He reported that he experienced dizziness, nausea, headaches and constant ringing in his ears and that these symptoms were not affected by medication (Tr. 101).  As of his request for recon-sideration on October 10, 1997, plaintiff stated that his attacks had become longer, more frequent, and more severe and were brought on by things like flashes of light, sudden movement of the head, or noise (Tr. 124).  He stated that his "frequent and severe" attacks had reached the point where they prevented him from being able to climb ladders, use power tools, or operate dangerous machinery (Tr. 99, 124).  He also noted that he still had a constant ringing in his ears and that his hearing loss was progressing[7] (Tr. 124).  By November 1997, plaintiff reported

_____

[7]Plaintiff reported at this time that he was not able to use
(continued...)

experiencing both dizziness and ringing in his ears daily (Tr. 131). Plaintiff also stated that he suffers from depression and an anxiety disorder that stem from his Meniere's disease (Tr. 124, 126).

Plaintiff stated that he first saw a doctor regarding these symptoms in 1995 (Tr. 122). In a letter to the Social Security Administration accompanying his October 10, 1997 request for reconsideration, plaintiff stated that symptoms of what is now diagnosed as Meniere's disease prevented him from working in 1994, even before he was diagnosed, and that the reason had not sought medical attention earlier was his extreme fear of doctors (Tr. 130). He reported that his episodes of dizziness finally became so bad in spring 1995 that both his wife and a neighbor insisted he see a doctor (Tr. 130).

    2.  Information Reported
        by Plaintiff's Wife

In a sworn statement dated October 17, 2001, Mrs. Margaret Kruppenbacher stated that plaintiff had talked about feeling dizzy and nauseous as early as 1980 (Tr. 540). She stated that plaintiff usually ignored the problem, perhaps because when he was a child, his parents made him feel bad when

---

[7](...continued)
hearing aids, but his reason was cut off the copied sheet (Tr. 124).

he needed any care or they had to spend money on him (Tr. 538).
Both Mrs. Kruppenbacher and plaintiff thought the dizziness might
be caused by lack of rest or by fumes plaintiff was exposed to at
his job as a tire mechanic (Tr. 540).  Mrs. Kruppenbacher related
one incident in 1983 in which plaintiff became so disoriented,
dizzy and nauseous that they had to cut short a visit with
friends (Tr. 540).  However, plaintiff and Mrs. Kruppenbacher
ignored this episode once it passed (Tr. 540).  She stated that
plaintiff used to grind his teeth and had a habit of clicking his
jaw or clearing his sinuses, which she speculated could be
related to his Meniere's disease (Tr. 540).  She added that when
plaintiff was sixteen, he was in a car accident in which he
smashed his face on the dashboard, but received no treatment
other than applying ice on his own (Tr. 541).  She noted that
plaintiff is often overcome by anger and that once in 1984
plaintiff and a friend chased someone with a shotgun (Tr. 540).
She stated that this incident led to an attempted murder charge
that was reduced to disorderly conduct (Tr. 540).  She stated
that plaintiff's dizzy spells became more frequent in 1991 and
would require him to stop what he was doing and sit or lie down
(Tr. 540).  Sometimes an episode was precipitated by the noises
the couple's children made (Tr. 540).

In an affidavit that is dated only October 2001,[8] Mrs.
Kruppenbacher stated that in the late 1980s and early 1990s,
plaintiff's vertigo, headaches and nausea became so bad that when
experiencing them he would have to cease whatever activity he was
doing and go somewhere quiet (Tr. 557).  At the time, she stated,
plaintiff did not seek medical treatment because she and plain-
tiff attributed these symptoms to stress caused by plaintiff's
boss (Tr. 557).  She reported that plaintiff was required to work
extremely long hours with Capelli Development and could not leave
work for personal reasons such as medical care (Tr. 557).
Plaintiff also once told her that he had considered suicide while
he was working on the roof of a multi-story office complex, and
often mentioned things like "jumping" and "blowing his brains
out" (Tr. 558).  He would also "take[] his frustrations out on
'things' as opposed to people," for example, smashing and throw-
ing radios (Tr. 537, 558).

Mrs. Kruppenbacher stated she did not push plaintiff to
get medical treatment even after he left the job at Capelli
Development because she thought being removed from the stressful
work environment would alleviate his symptoms (Tr. 558).  When it
became clear that the symptoms were persisting, she still re-
frained from encouraging plaintiff to see a doctor because he did

---

[8]In a cover letter to ALJ Zolezzi, plaintiff's counsel
stated this affidavit was dated October 23, 2001 (Tr. 561).

14

not want to go (Tr. 558).  She stated that plaintiff tried to do
odd jobs, but was somewhat limited by his unpredictable dizzy
spells (Tr. 558).  She recollected that she and plaintiff thought
the dizziness might be caused by smoking or not sleeping cor-
rectly (Tr. 558).  She stated that she eventually insisted
plaintiff seek medical treatment and took him to Dr. Schwartz,
who treated him for blood pressure so high it was approaching
stroke level (Tr. 559).  She also explained that their failure to
seek medical treatment sooner had been due in part to insurance
and financial concerns (Tr. 559-60).

   3.  <u>Treating Physicians</u>

     a.  <u>Dr. Michael Schwartz</u>

    Plaintiff saw Dr. Michael Schwartz three times starting
on August 12, 1995 (Tr. 134).  At the first visit, plaintiff
complained that he had suffered from a bout of intermittent
headaches and dizziness (but no vertigo) (Tr. 134).  The symptoms
lasted only a week and had resolved completely by one and a half
weeks prior to the visit (Tr. 134).  Dr. Schwartz's notes reflect
that plaintiff believed his symptoms may have been caused by an
outdated contact lens prescription (Tr. 134).  Dr. Schwartz also
noted mild hypertension and mild hypercholesterolemia (Tr. 134).
He opined that plaintiff's "dizziness may be secondary either to
the [hypertension] or a period of viral labrynthitis" (Tr. 134).

He prescribed Procardia, suggested that plaintiff reduce his salt intake and lose 10 to 15 pounds and instructed plaintiff to return immediately if his symptoms recurred (Tr. 134).  He also gave plaintiff a Nicoderm patch to assist his effort to quit smoking (Tr. 134).

Dr. Schwartz saw plaintiff again on August 26, 1995 (Tr. 135).  He reported that since starting Procardia plaintiff "has felt much improved with strength and vigor and no further dizziness, lightheadedness or vertigo" (Tr. 135).  Dr. Schwartz increased plaintiff's dose of Procardia and instructed him to maintain a low-sodium diet (Tr. 135).  Dr. Schwartz saw plaintiff for a third time on September 9, 1995 at which time he noted that plaintiff was not experiencing any more headaches or dizzy spells and increased plaintiff's Procardia dosage further (Tr. 135).

b.  Dr. Jose Fontanez

i.  Visit Notes

Plaintiff first started seeing Dr. Jose Fontanez, an internist at the Community Health Plan Clinic in East Fishkill, New York, because of high blood pressure (Tr. 86, 154).  Dr. Fontanez saw plaintiff for a "get acquainted" visit on January 25, 1996 (Tr. 154).  In his notes from this visit, Dr. Fontanez stated that plaintiff had a history of high blood pressure, controlled by Procardia (Tr. 154).  Plaintiff also reported

16

having experienced fatigue, night sweats, frequent headaches, dizziness, nausea and joint pain in the past, although a "[c]urrent review of systems [was] completely negative" (Tr. 154). Dr. Fontanez's notes reflect that plaintiff's visit was "essentially . . . a smoking cessation consultation," at the conclusion of which Dr. Fontanez prescribed a nicotine patch (Tr. 154-55). Dr. Fontanez also ordered an EKG exam, which showed that plaintiff had a "borderline first degree AV block" (Tr. 154).

Dr. Fontanez saw plaintiff for a physical exam on April 8, 1996, at which he found nothing abnormal except hypertension (Tr. 151-52). Plaintiff did not report any dizziness or head-aches at this visit (Tr. 151-52).

At a visit on December 2, 1996, plaintiff complained of episodes of vertigo and panic attacks (Tr. 148). Plaintiff stated at that he had been experiencing the dizziness and vertigo for two to three months, while the panic episodes had been occurring for over six months (Tr. 148). He stated that he had no tinnitus or loss of hearing, but that he had had several severe headaches over the last few months (Tr. 148). Dr. Fontanez reported that "plaintiff does admit to occasional head trauma, banging his head on the timbers of his basement house" (Tr. 148). An ear, nose and throat exam was negative (Tr. 148). Dr. Fontanez sent plaintiff for a CAT scan and prescribed

17

Antevert for vertigo and Klonopin for the panic episodes (Tr. 148). Dr. Fontanez offered to refer plaintiff to the Behavioral Health Department, but plaintiff declined the referral (Tr. 148).

Plaintiff saw Dr. Fontanez again on January 23, 1997 (Tr. 146-47). The notes from this visit indicate that plaintiff had a history of benign positional vertigo, that his coffee intake had increased but he had cut back from two packs of cigarettes a day to one pack, and that his hypertension was not optimally controlled (Tr. 146). Plaintiff stated at this visit that he was "feeling good and the pills [we]re working great" (Tr. 147). He did not report any headaches, dizziness, or vertigo (Tr. 146-47).

On another visit to the Community Health Plan Clinic on April 5, 1997, plaintiff reported that he was still unsteady, experiencing dizziness daily and "total[ly] disabled from [his] usual line of work" (Tr. 138). The physician, presumably Dr. Fontanez although his name does not appear on the page, noted an impression of "Meniere's disease" (Tr. 138). On a visit on May 15, 1997, plaintiff reported daily dizziness, that the episodes of vertigo lasted two to six hours, that he had hearing loss, and that he was experiencing constant ringing in his ears (Tr. 138).

Plaintiff saw Dr. Fontanez again on August 10, 1998 for pain, numbness and tingling in his left wrist and forearm (Tr. 491-92). It was noted that he had a history of carpal tunnel

18

syndrome and had received surgery for it in 1991 (Tr. 492).  Dr.
Fontanez made various findings with regard to plaintiff's symp-
toms and recommended a carpal tunnel splint and anti-
inflamatories; he also prescribed Naprosyn for pain (Tr. 492).
Plaintiff did not mention any current dizziness, vertigo or
headaches during this visit (Tr. 491-92).

Plaintiff saw Dr. Fontanez again on May 14, 1999 (Tr.
497).  He stated at this visit that his Meniere's symptoms were
still present and impaired his ability to work (Tr. 497).  Dr.
Fontanez noted that plaintiff "ha[d] been disabled from work
because of this condition however he [was] still in the midst of
the legal negotiations in order to make that disability final"
(Tr. 497).  He also noted that plaintiff's hypertension was not
as well controlled as it had been at his last visit (Tr. 497).

At a visit on February 23, 2000 Dr. Fontanez noted
plaintiff's history of hypertension, Meniere's disease, anxiety
and depression (Tr. 505-06).  He stated that plaintiff had been
"disabled and unable to work because of the chronic symptomology
associated with [Meniere's] disease" (Tr. 506).  At this visit,
plaintiff reported that he was experiencing sleeplessness,
pressure on his chest, slight nausea (but no vomiting), dizziness
and lightheadedness (Tr. 505-06).  He had recently been switched
from Prozac to Paxil for insurance reasons, which seemed to have
caused a "breakthrough of his anxiety symptoms" (Tr. 506).

19

Plaintiff blamed the switch for his lightheadedness, dizziness and chest pressure (Tr. 507).  Dr. Fontanez performed an EKG which yielded normal results, suggesting that plaintiff's lightheadedness, dizziness and chest pressure were not rooted in a cardiac problem (Tr. 507).  Dr. Fontanez indicated that he would discontinue the Paxil and send a formal request to rein-state Prozac (Tr. 508).

Plaintiff saw Dr. Fontanez or another individual in his office again on May 31, 2000 and July 20, 2000, but the notes from those visits are largely illegible (Tr. 511-13).  Plaintiff again visited Dr. Fontanez's office on September 6, 2000, at which time it was noted that he was on Lipitor in addition to his previous medications and that his eyes had been red, swollen and itchy for two weeks (Tr. 513).  The notes indicate that this was normal conjunctivitis (Tr. 513).

Plaintiff saw Dr. Fontanez again on February 21, 2001, complaining that his left ear had been clogged for two weeks after he had the flu (Tr. 514-15).  Dr. Fontanez's examination of plaintiff's head, eyes, ears, nose and throat "showed cerumen in both sides, but inflamed canals on the left" (Tr. 515).  Dr. Fontanez noted "left otitis externa" and prescribed eardrops of Cortisporin Otic suspension (Tr. 515).  In addition, plaintiff complained of a skin tag on his right arm, which Dr. Fontanez froze with liquid nitrogen (Tr. 515).  In addition, plaintiff

20

complained of knee pain for which he was referred to an orthope-
dist[9] and scheduled for X-rays (Tr. 515).  On March 1, 2001,
plaintiff's wife called Community Health Plan and reported that
plaintiff was still experiencing pain in his left knee (Tr. 516).

Plaintiff saw Dr. Fontanez again on November 19, 2001[10]
(Tr. 816).  Dr. Fontanez noted his history of depression, anxiety
and hypertension and treated him for heartburn (Tr. 816).
Plaintiff was seen in Dr. Fontanez's office on August 23, 2002
for cough, aches and pains; it was noted that he had a low-grade
fever (Tr. 817).  Plaintiff was seen again in Dr. Fontanez's
office on December 28, 2002[11] when, the notes indicate, he had a
severe headache, a productive cough with brown sputum, and pain
around his lungs (Tr. 818).

Plaintiff saw Dr. Fontanez again on May 12, 2003[12] for
a followup on his Meniere's disease, hypertension, anxiety and
depression (Tr. 819).  Dr. Fontanez also noted a history of

[9]On February 22, 2001, plaintiff saw Dr. Mangala Rajan, who
found no evidence of acute fracture or dislocation of the knee,
but stated that correlation with an MRI could be helpful if there
was any suspicion of internal derangements (Tr. 519).

[10]The record contains notes from a gastroenterology exam
performed at DBA Imaging and addressed to Dr. Fontanez on
November 28, 2001, indicating esophageal dysmotility and a small
hiatal hernia (Tr. 833).

[11]The record also contains a record of a chest X-ray on
December 28, 2002, which showed normal results consistent with a
cough (Tr. 832).

[12]The record also contains the results of a blood test from
May 19, 2003, ordered by Dr. Fontanez (Tr. 831).

21

hyperlipidemia (high blood cholesterol) (Tr. 820).  He stated
that plaintiff's "Meniere's disease [was] still chronic with
ringing in the ears and loss of hearing, as well as transient
vertigo" (Tr. 820).  Dr. Fontanez noted that plaintiff's Meni-
ere's disease was as stable as it normally was and that plaintiff
declined the option of surgery (Tr. 820).  Dr. Fontanez also
reported that plaintiff's depression and anxiety were stable,
controlled by Prozac (Tr. 820).

On October 16, 2003, plaintiff visited Dr. Fontanez's
office for three boils on his chest (Tr. 821).  Plaintiff also
appears to have visited Dr. Fontanez's office on May 14, 2004 and
July 26, 2004, although no new substantive information is con-
tained in the notes of those those visits[13] (Tr. 822-23).

Plaintiff visited Dr. Fontanez's office again on
November 26, 2004 (Tr. 866).  The notes from this visit indicate
that he had had a large red area on his left shin for three days
as well as a fever a few days prior (Tr. 866).  His condition was
identified as cellulitis (Tr. 866).  He was seen for followup on
the cellulitis on November 27, 2004 (Tr. 867), November 29, 2004

_____

[13]The record does contain the results of blood tests
conducted on May 14, 2004 and July 26, 2004 (Tr. 824-30), a urine
test from May 14, 2004 (Tr. 829) and a "diabetes mellitus flow
sheet" documenting test results from May 14 and July 26, 2004
(Tr. 815).

(Tr. 868), November 30, 2004 (Tr. 869) and December 7, 2004[14]
(Tr. 870).

Plaintiff saw Dr. Fontanez on December 16, 2004[15] for a
checkup not related to the cellulitis (Tr. 872).  Dr. Fontanez
noted a history of hypertension, Meniere's disease, anxiety,
depression, hyperlipidemia and type II diabetes (Tr. 872).
During this visit plaintiff also learned to use a glucometer (Tr.
873).  Plaintiff also appears to have visited Dr. Fontanez's
office on February 16, 2005 although there are no specific notes
from the visit beyond a list of medications plaintiff was taking
(Tr. 874).  Plaintiff saw Dr. Fontanez again on February 23,
2005[16] (Tr. 875, 877).  Dr. Fontanez reported that plaintiff came
in for followup on diabetes type II, hypertension and
hyperlipidemia (Tr. 877).  Dr. Fontanez discussed the status of
his diabetes and noted that he "reports he is feeling generally
well" (Tr. 877).  At some point, Dr. Fontanez referred plaintiff

---

[14]Plaintiff also got an imaging test of his left tibia and
fibula on December 7, 2004 at DBA, revealing mild degenerative
changes in the left ankle (Tr. 900).

[15]The record also contains the results of a blood test from
December 23, 2004 (Tr. 897-98).

[16]On the same day, plaintiff got a diabetic foot screen (Tr.
888).  The report noted some dryness and calluses but no loss of
protective sensation (Tr. 888).

to Dr. Gary R. Fink[17] for a consult for shoulder pain (Tr. 892-93).

Dr. Fontanez saw plaintiff again on August 29, 2005[18] (Tr. 878-79).  He noted plaintiff's history of hypertension, Meniere's disease, anxiety, depression, hyperlipidemia and type II diabetes (Tr. 879).

Dr. Fontanez saw plaintiff on October 5, 2005, at which time he gave plaintiff preoperative medical clearance for surgery to repair his torn rotator cuff on the right side (Tr. 880-81).  The surgery was scheduled for October 11, 2005 with Dr. Fink (Tr. 881).  As requested by Dr. Fink, Dr. Fonantez did a CBC, basic metabolic profile and an EKG (Tr. 881).  He noted that plaintiff felt generally well aside from pain related to his shoulder problem (Tr. 881).  He noted plaintiff's Meniere's disease under "Past Medical History" (Tr. 881).  Blood tests were also performed (Tr. 894).  Dr. Fontanez gave plaintiff medical clearance for the surgery and provided instructions on modifications to modify his medication leading up to surgery (Tr. 881).

---

[17]Dr. Fink saw plaintiff on June 21, 2005 and found a contusion and possible rotator cuff injury in his right shoulder (Tr. 892).  He noted that plaintiff fell off a stepladder landing on his right shoulder several months prior and had experienced pain and decreased range of motion (Tr. 893).  He noted that plaintiff was being treated for diabetes, hypertension and Meniere's disease and stated that plaintiff was disabled at the time (Tr. 893).  He recommended that plaintiff proceed with a "progressive range of motion program" and planned to see him again in two weeks (Tr. 893).

[18]Plaintiff also got blood tests on this date (Tr. 895-96).

Plaintiff was seen again in Dr. Fontanez's office on March 10, 2006 for followup on hypertension and hyperlipidemia and for complaints of epigastric pain (Tr. 883-84).  Plaintiff underwent an examination of his feet that day, which was within normal limits aside from calluses and hyperkeratotic, mycotic nails, for which Dr. Fontanez suggested plaintiff see a podiatrist (Tr. 884, 888-89).  Dr. Fontanez adjusted plaintiff's medication for hypertension and hyperlipidemia and referred him to Dr. Xie[19] or Dr. Marrone for an evaluation and potentially an upper endoscopy for his epigastric pain (Tr. 884).

Plaintiff was seen again in Dr. Fontanez's office on April 13, 2006 (Tr. 885-86).  Dr. Fontanez noted plaintiff's history of hyperlipidemia, hypertension, Meniere's disease, anxiety, depression and type II diabetes (Tr. 886).  Plaintiff complained of a sinus headache and yellowish green phlegm (Tr. 886).  He experienced "pain to percussion of maxillary sinuses"

---

[19]Plaintiff saw Dr. Quian Yun Xie at the Digestive Disease Center on March 16, 2006 for a consult related to his severe epigastric pain (Tr. 853).  Dr. Xie stated plaintiff was in good health other than a history of diabetes, hypertension and chronic diarrhea (Tr. 853).  He also reported that plaintiff had no significant hearing loss, tinnitus, vertigo, heart palpitations, chest pain or frequent urination (Tr. 854).  The record also contains a report of an abdominal exam from MD Imaging, dated March 16, 2006, listing an impression of hepatic steatosis and a "right renal cyst." (Tr. 849-50).  In addition, the record contains an operative report dated March 22, 2006 for an upper endoscopic ultrasonography with biopsy, which revealed a distended gallbladder with at least two stones (Tr. 847; see Tr. 890).

(Tr. 886).  Dr. Fontanez also noted pain in the left lower rib cage area, most likely due to muscle strain resulting from a sneeze (Tr. 886).

## ii.   Other Assessments
## <u>by Dr. Fontanez</u>

Dr. Fontanez sent a letter to Ronald White, plaintiff's former attorney, on March 6, 1997, elaborating on his RFC assessment (Tr. 176).  Dr. Fontanez stated:

> Although I have known the patient only since January of 1996, through my extensive contact with him at multiple office visits I have become convinced that his history of these complaints date back prior to December, 1994, and have in fact been present for possibly longer than four years.  This is my opinion based on my extensive dealings and multiple office visits with Mr. Kevin Kruppenbacher.  His symptoms according to his history, which is what I have to rely on since I did not take care of the patient prior to January 1996, [sic] it seems very clear to me that his symptoms were definitely present and were related to the current diagnosis[20] of Meniere's disease dating back prior to December, 1994

(Tr. 176).

On December 11, 1997, when Dr. Fontanez had been plaintiff's physician for slightly less than two years, Dr.

---

[20] Although Dr. Fontanez's March 6, 1997 letter refers to "the current diagnosis of Meniere's disease," it is unclear when Dr. Fontanez first arrived at this conclusion.  The reference to Meniere's disease in Dr. Fontanez's March 6, 1997 letter appears to be the first mention of the condition anywhere in plaintiff's medical records.  Notes from Dr. Fontanez or someone else at Community Health Plan also indicate an impression of Meniere's disease on April 5, 1997 (Tr. 138).

Fontanez performed a Medical Assessment of Residual Functional
Capacity (Tr. 166-71).  He reported that (1) plaintiff could lift
and carry no more than ten pounds (Tr. 166);[21] (2) plaintiff's
ability to stand and walk was affected by intermittent episodes
of vertigo, but his sitting ability was not affected (Tr. 167);
(3) plaintiff would have to lie down for indeterminable periods
of time during an eight-hour workday due to vertigo and drowsi-
ness caused by his medication (Tr. 167-68); (4) certain of
plaintiff's other physical activities, such as climbing, crouch-
ing and stooping were seriously impaired[22] (Tr. 168); (5) plain-
tiff's abilities to handle, pull and hear were affected by his
vertigo and tinnitus[23] (Tr. 168) and (6) plaintiff could not work
at heights or around moving machinery, noise, fumes, or vibration
and that he was partially restricted from working in conditions
involving temperature extremes or exposure to chemicals[24] (Tr.
169).  Dr. Fontanez stated that these limitations affected
plaintiff all the time and concluded that he could not work at

[21]Dr. Fontanez stated that this assessment was supported by
positive nystagmus and a positive result on some type of
"maneuver," the description of which is illegible (Tr. 166).

[22]Dr. Fontanez stated that this conclusion was based on his
physical findings (Tr. 168).

[23]Dr. Fontanez stated that this assessment was supported by
an audiogram finding moderate to severe bilateral "S-N" hearing
loss, primarily at high frequencies (Tr. 168).

[24]Dr. Fontanez stated that these findings were supported by
plaintiff's physical symptoms and his examinations of plaintiff
(Tr. 170).

27

all (Tr. 170).  He further stated that the limitations he noted
had existed since 1994 (Tr. 171).

       c.  <u>Dr. Misha Kucherov</u>

      Plaintiff was referred to Dr. Misha Kucherov, a neurol-
ogist with Community Health Plan, by Dr. Fontanez in early March
1997 (Tr. 84, 86).  Plaintiff saw Dr. Kucherov on March 13, 1997
and reported episodes of dizziness, vertigo and nausea (Tr. 145).
The notes state that plaintiff had experienced a sudden onset of
dizziness "since December" and that his dizzy spells lasted up to
a full day and occurred about four times a week (Tr. 145).
Plaintiff denied any injury or head trauma (Tr. 145).  The notes
state that changes in position did not affect the symptoms (Tr.
145).  Dr. Kucherov noted potential Meniere's diease (Tr. 145).
Dr. Kucherov ordered an electronystagmomgram ("ENG") and
audiometry (Tr. 145; <u>see</u> Tr. 84).  The notes also state that
plaintiff had problems with coordination, memory and hand func-
tion (Tr. 145).

       d.  <u>Barbara McLain, C.S.W.</u>

      Dr. Kucherov referred plaintiff to Ms. Barbara McLain,
a certified social worker with Community Health Plan, for infor-
mation on Social Security disability (Tr. 144).  On March 13,
1997, McLain noted that plaintiff "is self-employed and cannot do

construction work at this time" (Tr. 144).  Her initial note
stated that he had been having dizzy spells since December --
presumably meaning December 1996 (Tr. 144).  On March 19, 1997,
McLain had a telephone conversation with plaintiff in which he
stated he may have Meniere's disease and in which she gave him
information about applying for Social Security DIB (Tr. 144).
Notes from a phone conversation between McLain and plaintiff on
April 7, 1997 indicate that he was complying with medical treat-
ment for Meniere's disease, that he was told by his physician he
would not be able to work for a period of time and that McLain
gave him information on job retraining and on difficulties he may
encounter in applying for Social Security (Tr. 137).  On May 12,
1997, McLain had another phone conversation with plaintiff in
which he stated he had applied for Social Security (Tr. 136).  He
reported that his condition was getting worse and that the
ringing in his ears was almost constant (Tr. 136).  Although he
sometimes felt depressed, he was coping well and trying to stay
as active as possible (Tr. 136).  McLain noted that she closed
the case at that time (Tr. 136).

> e.  <u>Dr. Darist Shah</u>

Plaintiff states that he saw Dr. Darist K. Shah in
October and November of 1997 for dizziness and ringing in his
ears (Tr. 131).  Plaintiff described Dr. Shah as a specialist in

Meniere's disease (Tr. 37).  A consultation report from Dr.
Shah's office dated October 21, 1997 states that plaintiff has
"'had dizziness' since childhood although in the mid to late 80s
his vertiginous spells increased in nature" (Tr. 464).  Plaintiff
reported that his episodes of dizziness lasted for two days and
occurred about three times a month (Tr. 464).  The dizziness was
"somewhat positional in nature" and occasionally accompanied by
nausea and vomiting (Tr. 464).  He also experienced "positional
light headedness" (Tr. 464).  Dr. Shah noted that plaintiff's
tinnitus was present on both sides and was worsening in his right
ear, but without active fluctuation (Tr. 464).  He stated that
the tinnitus impeded plaintiff's concentration and sometimes kept
him up at night (Tr. 464).  He felt fullness and pressure on both
sides and had been experiencing progressive hearing loss since
the mid 80s (Tr. 464).  Although it is unclear what job or time
period he is referring to, Dr. Shah stated that plaintiff was
exposed to loud noise at work without ear protection (Tr. 464).
He stated that plaintiff also had occasional headaches that did
not coincide with his dizzy episodes (Tr. 464).

Dr. Shah noted that plaintiff had previously had a
normal MRI and a normal blood evaluation (Tr. 464).  He stated
that plaintiff was on diuretics for blood pressure which may have
had a positive effect on his Meniere's disease, and that plain-
tiff had restricted his intake of salt and caffeine (Tr. 464).

30

Dr. Shah noted that plaintiff's past surgical history includes pyloric stenosis repair, hernia repair and carpal tunnel repair and that his medical history includes hypertension and depression (Tr. 464). During the same visit, Dr. Shah performed a physical examination and plaintiff had an audiogram which revealed mild low tone loss and high frequency sensory neural loss in both ears (Tr. 465). Dr. Shah noted that a prior ENG test revealed a right sided caloric weakness (Tr. 465).

Dr. Shah stated that plaintiff "certainly ha[d] right sided inner ear dysfunction" but that the cause was unclear (Tr. 465). He suspected that plaintiff had an atypical form of Meniere's disease in the right ear (Tr. 465). Dr. Shah noted that plaintiff suffered from benign positional vertigo, which he stated occurs at higher rates in individuals who have Meniere's disease (Tr. 465). Dr. Shah also opined that the inner ear dysfunction on plaintiff's right side could be caused by an inner ear fistula (Tr. 465). Dr. Shah prescribed medication for plaintiff's tinnitus and asked plaintiff to stop his Prozac and cut back on smoking (Tr. 466). Dr. Shah noted that surgery would be unlikely to help significantly because plaintiff did not have typical Meniere's disease, but stated that he would discuss other treatment options with plaintiff and would look into getting an

"Ecog" (electrocochleography)[25] study to determine whether the problem was Meniere's disease (Tr. 466).

Dr. Shah saw plaintiff again on November 6 (Tr. 490). Dr. Shah's notes from this visit stated that plaintiff needed to determine whether his right sided inner ear dysfunction actually was Meniere's disease in order to select the appropriate treatment (Tr. 490). Plaintiff stated his symptoms were about the same, including significant tinnitus, and they discussed plans to obtain an Ecog test in New York City (Tr. 490).

### f. Terri Hershkowitz, N.P.-P.

In October and November of 1997, plaintiff saw Terri Hershkowitz, a nurse practitioner in psychiatry, for psychiatric treatment and maintenance of his Prozac (Tr. 132). Plaintiff first saw Hershkowitz on October 2, 1997 (Tr. 469). He reported to her that he had been diagnosed with Meniere's disease since 1996 (Tr. 469). He described his symptoms as being provoked by seeing motion, i.e., watching a TV commercial with swirling papers (Tr. 469). Plaintiff reported that his condition prevented him from working and that he was depressed and angry because he had heard he may not qualify for disability (Tr. 469). The notes state that plaintiff's depression was "characterized by

---

[25]Such a study measures electric potentials in the inner ear in response to acoustic stimulation. Dorland's Illustrated Medical Dictionary, 607 (31st ed. 2007).

feeling irritable, feeling short tempered with his kids, getting into situations and being disproportionately angry when before, he wouldn't have been" (Tr. 469).  Plaintiff reported having difficulty sleeping and concentrating and becoming extremely tired in the afternoons (Tr. 469).  He had a history of panic attacks in the middle of the night, especially before he started taking Klonopin and possibly going back to 1986 (Tr. 469).  Ms. Hershkowitz noted that plaintiff admitted to "vague suicidal ideations" (Tr. 470).  Hershkowitz started plaintiff on Prozac and encouraged him to take an extra dose of Klonopin at night to help prevent panic attacks (Tr. 470).

Hershkowitz saw plaintiff again on November 14, 1997 (Tr. 471).  She reported that he had been diagnosed with Meniere's syndrome and had episodes of vertigo that incapacitated him for one to two days, making him unable to work or function at all (Tr. 471).  He was experiencing depression stemming from Meniere's, which he reported was unchanged with the Prozac (Tr. 471). Hershkowitz and plaintiff discussed the possibility that plaintiff's smoking was contributing to his Meniere's disease (Tr. 471).

At another visit on December 24, 2007, Hershkowitz noted that plaintiff was experiencing stress resulting from Meniere's disease as well as depression-related symptoms of "extreme agitation, lacking motivation, poor energy, feeling

33

tired in the afternoons and having difficulty sleeping" (Tr. 472).  However, plaintiff also stated he was responding very well to the increased dose of Prozac and feeling less irritable (Tr. 472).  He reported that the frequency of his dizziness attacks had decreased to once every few weeks (Tr. 472).

g.  Kathy Gray-Bailey, C.S.W.

Plaintiff saw Ms. Kathy Gray-Bailey, a certified social worker, on October 1, 1997, October 9, 1997 and October 24, 1997 (Tr. 835-36).  The intake notes from the initial visit state that plaintiff had been diagnosed with a middle ear disease that had prevented him from working but that he did not qualify for Social Security disability (Tr. 835).  Plaintiff stated that he was having a hard time dealing with being unable to provide for his family (Tr. 835).  He also stated he was tense and irritable with bad impulse control (Tr. 835).  Ms. Gray-Bailey noted plaintiff's history of child abuse and residential treatment as an adolescent (Tr. 835).  She found plaintiff was cooperative, pleasant, related and coherent, with insight, memory and judgment intact and no evidence of psychotic thinking (Tr. 835).  She stated that his mood was depressed and his affect anxious and sad (Tr. 835).  She reported that he did not have any suicidal ideations (Tr. 835-36).

34

Notes from plaintiff's visit with Ms. Gray-Bailey on October 9, 1997 indicate that he was less anxious and irritable and had been prescribed anti-depressants (Tr. 836).  At a visit with Ms. Gray-Bailey on October 24, 1997, plaintiff stated he was less depressed and anxious but that he worried about finances and how to support his family (Tr. 836).

### h.  Dr. Stephen Levine

Plaintiff saw Dr. Stephen Levine, a psychologist, at Spectrum Behavioral Health starting on July 28, 2004 (Tr. 809). Dr. Levine's intake evaluation stated that plaintiff was seeking psychotherapy to help with anger management, that he had been troubled for over two years and that he was growing more frustrated with his situation, taking it out on family members and strangers (Tr. 809).  Plaintiff reported always having been somewhat short tempered, but that it had gotten worse since he became disabled and could no longer work and that he often overreacted to minor events (Tr. 809).  Dr. Levine noted that plaintiff had physical problems -- diabetes, vertigo, elevated blood pressure, high cholesterol, and chronic leg and joint pain -- some of which exacerbated his irritability (Tr. 809).  Dr. Levine stated that plaintiff had been depressed or sad for two or more weeks, that he had poor concentration and/or indecision, that he suffered from irritability and that he felt worthless or

35

hopeless (Tr. 810).  Dr. Levine noted that plaintiff had been abused as a child and was suspicious of others' motives (Tr. 811).  Dr. Levine's mental status exam found that plaintiff was depressed and irritable, that his affect was appropriate, that his speech was within normal limits, that his insight and judgment were fair, that his attention and concentration were impaired, that his thought processes were linear, that his thought content was topical, that he tested within normal limits for "Reality Testing" and memory and that he had no suicidal or homicidal ideations or history of attempts (Tr. 812).  Dr. Levine noted preliminary diagnoses of major depressive disorder, impulse control disorder, diabetes, vertigo and hypertension (Tr. 812).

Dr. Levine saw plaintiff again on August 25, 2004 (Tr. 813).  His notes indicated that they talked about plaintiff's anger and frustration with the Social Security process and his pride in his children (Tr. 813).  Plaintiff saw Dr. Levine again on November 7, 2004 (Tr. 813).  Dr. Levine's notes from this session state that plaintiff "has several issues to be angry about and he seems to hold onto this anger, which is added to by his many physical ailments" (Tr. 813).  Notes from a subsequent visit with Dr. Levine on December 1, 2004 indicate that plaintiff was in good spirits and that his anger was generally under control (Tr. 814).

Notes from December 13, 2004 state Dr. Levine and plaintiff had a session focusing on plaintiff's physical disabilities and their effect on his life (Tr. 814). The notes state that plaintiff took many medications that led to side effects requiring more medications (Tr. 814). Dr. Levine stated that plaintiff saw the productive part of his life as over and did not have anything to look forward to other than seeing his children grow up (Tr. 814). At a visit on September 29, 2004, plaintiff discussed his frustration with his physical problems and his worries that others would think badly of him (Tr. 858). Plaintiff had a visit with Dr. Levine on February 9, 2005 during which they discussed the suicides of plaintiff's uncle and his paternal grandfather; the rest of the notation is largely illegible (Tr. 863). On a visit on March 9, 2005, plaintiff reported that he had not been having outbursts of rage at home, but that he was still impatient and frustrated with his situation (Tr. 863). Notes from a visit on March 30, 2005 are largely illegible (Tr. 862). In the notes from a visit on August 11, 2005, Dr. Levine reported that plaintiff had ridden his motorcycle for the first time in a year and a half, but the rest of the notes are illegible (Tr. 862).

On September 7, 2005, Dr. Levine noted that plaintiff "returns after a long absence, indicating that he had fallen off the second step of a ladder [and] completely tore his rotator

37

cuff" (Tr. 861).  Dr. Levine noted plaintiff had scheduled
surgery for the next month (Tr. 861).  Plaintiff reported that he
has been frustrated with his pain and the condition he was in
(Tr. 861).  Plaintiff was experiencing anxiety attacks once or
twice weekly, feeling like he had to get up and walk around in
the middle of the night (Tr. 861).  Much of the middle of the
notation is illegible (Tr. 861).  Dr. Levine stated that plain-
tiff "appear[ed] more depressed; but [was] hopeful that shoulder
surgery [would] alleaviate pain" (Tr. 861).

        During a visit with Dr. Levine on September 28, 2005,
plaintiff stated he felt increased frustration and rage due to
his torn rotator cuff, for which he was scheduled to have surgery
in October (Tr. 860).  Notes from November 2, 2005 state that
plaintiff had had rotator cuff surgery and would face limited
mobility and a long rehabilitation process (Tr. 859).  Dr. Levine
stated that plaintiff's anxiety had improved in the weeks since
the surgery, with no anxiety attacks (Tr. 859).  Plaintiff
reported, however, that he felt he was being irritable with his
family (Tr. 859).  Plaintiff saw Dr. Levine again on November 15,
2005, at which time they discussed the death of his best friend
several years earlier (Tr. 859).

        The record also includes a transcript of a session in
which plaintiff's counsel asked Dr. Levine a series of questions
(Tr. 838-44).  The session occurred on September 15, 2005, and

38

Dr. Levine appears to have sworn to the accuracy of the tran-
script on January 13, 2006 (Tr. 838-44).  Dr. Levine noted first
that he was a licensed psychologist in New York and had treated
plaintiff since July 2004, seeing him 11 times (Tr. 838).  He
stated that at their first visit plaintiff reported he was having
problems with anger, irritation and impulse control (Tr. 838).
He also suffered from depression connected to his physical
problems including Meniere's disease, dizziness and vertigo (Tr.
838-39).  Plaintiff could not work or participate in many activi-
ties at all, but he displayed a willingness to attend counseling
and therapy in the hope it would improve his relations with his
family (Tr. 839).

In later visits, plaintiff told Dr. Levine that two or
three times a week he would wake up in the middle of the night
having a panic attack that involved sweating, his heart pounding,
a need to get outside and fear of dying from a heart attack if he
laid down (Tr. 839).  Recently, Dr. Levine stated, the panic
attacks had become less frequent (Tr. 839), but he indicated that
the panic attacks and other outbursts had been occurring since
1994 or before (Tr. 842).  Dr. Levine believed that the anxiety
attacks must be connected to the time plaintiff spent in a
residential center as an adolescent and to the abuse he experi-
enced as a child; however, he stated that he disagreed with the
diagnosis of PTSD made by Dr. Gindes in a consultative psychiat-

39

ric evaluation (discussed below), as plaintiff did not specifi-
cally report reliving traumatic events (Tr. 840).

Dr. Levine stated that Dr. Gindes' assessments of
seriously impaired attention and concentration due to anxiety,
emotional distress due to anxiety disorder and inability to do
serial threes were not consistent with his own observations of
plaintiff, because plaintiff was not overly anxious in the office
with him -- but that the difference might be due to differences
between a therapeutic environment and an evaluative environment
(Tr. 841).  Dr. Levine agreed with Dr. Gindes' assessment that
plaintiff had memory and concentration difficulties that pre-
vented him from performing complex tasks but stated that these
might derive from his chronic pain and frustration rather than
his anxiety (Tr. 842).  He did not agree with Dr. Gindes that
plaintiff's rage stemmed from PTSD, opining instead that it
resulted from many things including Meniere's, his other physical
problems and the many medications he took (Tr. 842).

Dr. Levine agreed with Dr. Gindes' opinions that
plaintiff had a marked limitation in his ability to carry out,
understand, and remember detailed instructions; that plaintiff
had a marked impairment in his ability to respond appropriately
to work pressures in a usual work situation; and that plaintiff
had a marked impairment in his ability to interact appropriately
with supervisors, coworkers and the public (Tr. 843).  When asked

40

whether he thought plaintiff had these marked limitations when he
left his job in 1991, Dr. Levine stated "it's reasonable to think
that it might have but we're talking about a 10 year gap
from . . . " and then, after further questioning, stated it was
"[m]ore reasonable than not" that he had the limitations in 1994
(Tr. 843).  Dr. Levine also stated that it would be reasonable to
say that what Dr. Gindes reported when he evaluated plaintiff in
2001 was also present between 1991 and 1994 (Tr. 844).  Dr.
Levine stated that plaintiff might have delayed reporting his
symptoms because he learned not to talk about his feelings or
problems during his traumatic childhood (Tr. 844).  He also
stated he would have no reason to believe plaintiff and his wife
were "making this up out of whole cloth" (Tr. 842).

It appears that plaintiff saw Dr. Levine again on
January 19, 2006 and February 15, 2006 but the notes from these
visits are largely illegible (Tr. 857-58).  Plaintiff also saw
Dr. Levine on March 15, 2006 (Tr. 857).  Although much of these
notes are also illegible, Dr. Levine reported that plaintiff had
an anxiety attack the week before in conjunction with a new pain
in his stomach (Tr. 857).

i.  Unidentified Providers

The record also contains an undated, unsigned sheet
which includes what appears to be the sketch of an inner ear and

41

lists the following: "sudden dizziness-vertigo (since December),
nausea, no tinnitus, no recent illnesses, no [history] of ear
infections, Procardia . . . Meclizine, anxiety, minor difficulty
hearing, construction building management, wears ear protection
when exposed to loud noise, ear canals clear all, family [his-
tory] of hearing loss" (Tr. 473).

        Also in the record is a set of notes from a telephone
consultation form dated June 3, 1999, signed by a doctor and a
nurse both of whose signatures are illegible (Tr. 498).  The form
contained notes from a call with plaintiff's wife, who appears to
have reported that plaintiff was passing blood with his bowel
movements (Tr. 498).

                4.   Consultative Physicians

                     a.   Dr. Jeffrey Rubin

        On August 29, 2001, Dr. Jeffrey Rubin, a psychologist,
conducted an examination of plaintiff (Tr. 542-47).  In addition
to depression and hypertension, his report noted Meniere's
disease since the 1980s, with continuing symptoms of fullness in
his head, nausea, tones in his ears, loss of balance, and dizzi-
ness (Tr. 543).  Plaintiff reported experiencing dizziness around
the age of eight or nine (Tr. 544).  He also reported a history
of head trauma including:  being beaten on the head with a
baseball bat until he lost consciousness; impact to the head in a

                              42

car accident in 1988 or 1989; some kind of a head trauma at age 13 while he was living in the residential treatment facility; being hit on the head with a baseball bat in high school; hitting his head on a beam in 1996; and several impacts to the head incurred while working in construction (Tr. 544). Dr. Rubin opined that plaintiff's conditions, including his psychological status and Meniere's disease, had probably been affected by the numerous head traumas he had experienced and recommended an examination by a neurologist specializing in head trauma in order to rule out neurological dysfunction (Tr. 542, 544, 547).

Dr. Rubin noted that plaintiff spent fourteen months in a residential treatment facility because of chronic absenteeism from school, attended an alternative high school and had several juvenile offenses, including assault, disorderly conduct and speeding (Tr. 544). Plaintiff grew up with his mother who was an alcoholic, had three brothers with substance addictions, and had a grandfather and uncle who both committed suicide (Tr. 544). Plaintiff had been receiving counseling and Prozac for depression (Tr. 544). He felt persecuted and useless, thought he was not contributing enough to his family or society, and was short-tempered (Tr. 544-45). Dr. Rubin noted that plaintiff experienced panic attacks about three times a month in which he experienced shaking, a rapid heartbeat and a feeling of suffocation

(Tr. 544).  Plaintiff also reported that he had flashbacks of
physical abuse he experienced as a child (Tr. 544).

Dr. Rubin found plaintiff cooperative and attentive,
with relevant coherent speech and clear progression of thought
(Tr. 545).  He stated that plaintiff had had suicidal ideation in
the past but denied attempts or plans (Tr. 545).  Dr. Rubin found
plaintiff's insight and judgment fair at best, found his mood
moderately dysphoric, and found his affect "essentially flat"
(Tr. 545).  Plaintiff was not able to count backward from one
hundred by sevens at the examination (Tr. 545).  Dr. Rubin stated
that plaintiff takes care of his own personal hygiene, spends the
day inactive at home, has poor sleeping patterns and overeats
(Tr. 545).

Dr. Rubin performed intelligence testing (Tr. 543, 545-
46).  Using the WAIS-III test, Dr. Rubin found a verbal I.Q. of
98, a performance I.Q. of 81 and a full scale I.Q. of 91, indi-
cating that plaintiff's overall cognitive potential was average
(Tr. 543).  Dr. Rubin stated that the difference between the
overall verbal and performance scores may be indicative of right
hemisphere dysfunction (Tr. 546).  The test results also sug-
gested "attentional difficulties" (Tr. 546).

Dr. Rubin's diagnoses included:  major depressive
disorder, recurrent, severe with psychotic features; chronic
PTSD; panic disorder without agoraphobia; Meniere's disease and

44

hypertension (Tr. 546). He also noted that plaintiff had severe psychosocial stressors related to financial and occupational difficulties (Tr. 546).

In Dr. Rubin's opinion, plaintiff did "not appear to be able to pursue active and full time employment" (Tr. 547). He found that plaintiff would be able to manage benefit payments in his own interest (Tr. 547).

Dr. Rubin also completed a mental residual functional capacity ("RFC") assessment on Setpember 7, 2001 (Tr. 548-54). Several portions of the assessment simply refer the reader to the report described above, but it did include some substantive information (Tr. 458-54). The assessment stated that plaintiff's symptoms included withdrawal or isolation, flat affect, anhedonia or pervasive loss of interests, sleep disturbances or dysfunc-tion, decreased energy, feelings of guilt or worthlessness, difficulty thinking or concentrating, poor memory, distractability/short attention span, suicidal ideation, appre-hensive expectation, recurrent panic attacks, intrusive recollec-tions of a traumatic experience, paranoia/paranoid thinking, inappropriate suspiciousness, delusions, mood disturbance and emotional lability (Tr. 548). Dr. Rubin gave plaintiff a "poor" prognosis (Tr. 549).

Dr. Rubin opined that plaintiff was markedly limited in all sub-areas of understanding and memory (Tr. 549), markedly

45

limited in all sub-areas of concentration and persistence (Tr. 550), markedly limited in all sub-areas of social interaction (Tr. 550) and markedly limited in all sub-areas of adaption (Tr. 551).  He indicated that plaintiff's impairment had lasted or could be expected to last for twelve months and that plaintiff was not a malingerer (Tr. 551).  He stated that plaintiff's combined impairments could be reasonably expected to produce the subjective symptoms and functional limitations in the evaluation, and that plaintiff's psychiatric condition exacerbated his experience of physical symptoms (Tr. 551).  Dr. Rubin estimated that plaintiff's impairments would cause him to be absent from work over four times a month (Tr. 552).  He stated that plaintiff had a low I.Q. or reduced intellectual functioning and found that plaintiff's ability to function outside of a sheltered/structured environment was "extremely limited" (Tr. 551-52).  He opined that plaintiff had a severe limitation in his ability to deal with work stress and was not able to work (Tr. 552).  He stated that stress had a "significant" role in prompting plaintiff's symptoms and that any situation outside the home environment would be stressful to plaintiff (Tr. 552).

Dr. Rubin also completed a form entitled "Assessment of Functional Limitations" on September 7, 2001, in which he stated that plaintiff had a marked restriction of activities of daily living, marked difficulties in maintaining social functioning,

constant deficiencies in concentration, persistence or pace and
continual deterioration or decompensation in work or work-like
situations (Tr. 555).

b. Dr. Alex Gindes

On September 20, 2001, Dr. Alex Gindes, a clinical
psychologist, performed a psychiatric evaluation of plaintiff
(Tr. 522-25, 527).  He obtained information from both plaintiff
and plaintiff's wife (Tr. 522).  Dr. Gindes noted that plaintiff
spent fourteen months at the Berkshire Youth Program as a teen-
ager because of violent episodes (Tr. 522) and was arrested
numerous times for attempted murder and assault and battery and
served time in jail (Tr. 523).  Dr. Gindes noted that plaintiff
attended an alternative high school for emotionally disabled
students for his last two years of school (Tr. 522).  He stated
that plaintiff's last employment was as a construction worker in
1991 and that he was told to stop working because of vertigo,
nausea and tinnitus (Tr. 522).  Dr. Gindes stated that psycholog-
ical factors have also impeded plaintiff's ability to work (Tr.
522).

Dr. Gindes stated that plaintiff reported "chronic
dysphoric moods, a sense of worthlessness, irritability, and
frequent rage episodes alternating with guilt" and that he
occasionally experienced nightmares and flashbacks of alleged

47

severe childhood abuse inflicted by his mother (Tr. 522-23).  Dr.
Gindes also noted that plaintiff experienced panic attacks and
rageful episodes characterized by cardiac palpitations, trem-
bling, chest pain, fear of losing control and dizziness (Tr.
523).  Plaintiff denied symptoms of bipolar or formal thought
disorders and symptoms of significant cognitive dysfunction (Tr.
523).

          Dr. Gindes stated that plaintiff was diagnosed with
Meniere's disease in 1997 and hypertension in 1994 (Tr. 523).  He
reported that plaintiff wakes up frequently in the night needing
to urinate (Tr. 522).  Dr. Gindes noted three surgeries not
related to his Meniere's disease (Tr. 523).  Dr. Gindes found
that plaintiff was cooperative though frequently defensive, that
he had adequate social skills and that he was well groomed with a
normal gait, tense posture, normal motor behavior and appropriate
eye contact (Tr. 523).  His speech was fluent and he had adequate
expressive and receptive language skills (Tr. 523).  His thought
processes were coherent and goal directed (Tr. 524).  His affect
was "tense and dysphoric, but appropriate to speech and thought
content" and his mood was anxious and depressed (Tr. 524).  Dr.
Gindes noted that plaintiff's "attention and concentration were
seriously impaired due to anxiety in the evaluation and emotional
distress resultant to anxiety disorder" (Tr. 524).  Plaintiff's
memory skills were mildly impaired and his calculation skills

were "highly questionable" (Tr. 524-25).  Dr. Gindes estimated

his intellectual functioning as below average to borderline and

found his insight and judgment to be fair (Tr. 524).

        Dr. Gindes found that plaintiff could dress, bathe and

groom himself as well as do some cooking and cleaning (Tr. 524).

He could not drive due to his Meniere's disease, but could take

public transportation (Tr. 524).  He could not do laundry, shop,

or manage money (Tr. 524).  Plaintiff isolated himself from

social contact, spending much of his time at home alone (Tr.

524).  Dr. Gindes stated that plaintiff was "able to follow and

understand simple directions and instructions, and to perform

simple rote tasks under supervision.  He [wa]s not likely to

maintain attention and concentration for tasks given serious

problems in th[ose] area[s]" (Tr. 524-25).  He found that plain-

tiff "may have occasional difficulties making appropriate deci-

sions due to gaps in his judgment" (Tr. 525).  He stated that

plaintiff was "likely to have difficulties learning new tasks due

to impaired memory" (Tr. 525).  He also stated that plaintiff was

"not likely to perform complex tasks independently given his

memory, attention, and concentration difficulties," nor was he

likely "to relate adequately with others or appropriately deal

with stress primarily because of his considerable rage associated

with the chronic posttraumatic stress disorder" (Tr. 525).  Dr.

Gindes found that the results of his examination were consistent

49

with plaintiff's allegations (Tr. 525).  He stated that plaintiff
would not be able to manage benefits given his "highly question-
able calculation skills" (Tr. 525).  Dr. Gindes' diagnoses
included chronic PTSD; personality disorder, not otherwise
specified, with avoiding features; Meniere's disease; hyperten-
sion and a rule-out diagnosis of borderline intellectual func-
tioning (Tr. 525).  Dr. Gindes gave plaintiff a prognosis of
"fair with complete and continuous mental health treatment" (Tr.
525).

          Dr. Gindes also completed a "Medical Source Statement
of Ability to Do Work-Related Activities (Mental)" (Tr. 526).  He
found that plaintiff had the following restrictions (Tr. 526):
(1) a slight restriction in his ability to "[u]nderstand and
remember short, simple instructions"; (2) a moderate restriction
in his ability to "[c]arry out short, simple instructions"; (3) a
marked restriction in his ability to "[u]nderstand and remember
detailed instructions"; (4) a marked restriction in his ability
to "[c]arry out detailed instructions" and (5) a moderate re-
striction in his ability to "make judgments on simple work-
related decisions" (Tr. 526).  Dr. Gindes stated that these
restrictions were supported by plaintiff's "short and long-term
memory impairments, gaps in judgment as related to interpersonal
and social issues [and] attention and concentration problems"
(Tr. 526).

50

Dr. Gindes also found that plaintiff had the following further restrictions:  (1) a marked restriction in his ability to "[i]nteract appropriately with the public"; (2) a marked restriction in his ability to "[i]nteract appropriately with supervisor(s)"; (3) a marked restriction in his ability to "[i]nteract appropriately with co-workers"; (4) a marked restriction in his ability to "[r]espond appropriately to work pressures in a usual work setting" and (5) a moderate restriction in his ability to "[r]espond appropriately to changes in a routine work setting" (Tr. 527).  He stated that these restrictions were supported by plaintiff's "depressed mood, chronic apprehension, rageful episodes, low self esteem and compensatory paranoia in interpersonal relations, panic attacks associated with pent-up rage, and flashbacks of alleged severe childhood abuse by alch[olic] mother" (Tr. 527).

Dr. Gindes also stated that plaintiff's appropriate socialization capabilities were affected by the impairment, given his "almost complete social isolation for fear of embarrassment [due to] rage" (Tr. 527).  He stated that this assessment was supported by "avoidance of socialization as reported by [plaintiff's] spouse" (Tr. 527).

5.  Medications

         The record contains no evidence of any medications
taken by plaintiff in December 1994 or before, and plaintiff
testified at the April 2, 1998 hearing that he had not been
taking any medication before July 1995 (Tr. 28).  In the Disabil-
ity Report he completed for the Social Security Administration in
conjunction with his initial application in spring 1997, plain-
tiff reported that he was taking Hydrocholorothiazide (a/k/a
Hydrochlorot or HTCZ) and Acetazolamide (a/k/a Diamox) prescribed
by Dr. Kucherov to relieve pressure in his ears, Meclizine HCl
prescribed by Dr. Fontanez for vertigo, Clonazepam (a/k/a
Klonopin) prescribed by Dr. Fontanez for anxiety, and Nifedipine
(a/k/a Procardia, Adalat CR, or Nefediac CC) prescribed by Dr.
Fontanez for high blood pressure (Tr. 95).  The record indicates
that plaintiff took numerous other medications at various times,
including:  Amitripyline, Accupril (a/k/a Quinapril), Albuterol,
Anucort-HC, Azithromycin (a/k/a Zithromax), Ecetavolamide,
Cephalaxin (a/k/a Keflex), Crestor, Fluoxetine HCl (a/k/a
Prozac), Glyburide, Levaquin, Lipitor, Metformin, Nabumetone,
Omeprazole, Patanol, Paxil, Prevacid, Propo-N, Protonix,
Ranitidine and Tricor (Tr. 132, 173, 146, 469, 488-89, 491, 496,
505-06, 512, 513, 522-23, 543, 585-89, 802, 803, 805, 806, 866,
872).

6.   <u>Medical Tests</u>

Plaintiff underwent an EKG on January 25, 1996, which showed "regular sinus rhythm, borderline first degree AV block [and] otherwise normal tracing" (Tr. 154).  Plaintiff also had an MRI at Dutchess Radiology Associates in Poughkeepsie, New York on December 5, 1996, which revealed no brain abnormalities (Tr. 157, 164; <u>see</u> Tr. 86).  Plaintiff also underwent some sort of hearing test on March 14, 1997, though the location was not indicated on the record (Tr. 468).  The audiologist noted moderate to severe high frequency sensory neural loss bilaterally and recommended "complete audio" testing (Tr. 468).

Plaintiff received an electronystagmogram ("ENG")[26] test at St. Francis Hospital in Poughkeepsie, New York on March 24, 1997 (Tr. 139).  The initial notes from the test state that plaintiff had reported episodes of vertigo and nausea lasting eight hours or more, three times a week, dating back to December 1996 (Tr. 139).  He also reported double vision, weakness, clumsiness and difficulty speaking (Tr. 138).  The results of the ENG were abnormal, showing a "marked right unilateral weakness . . . which strongly suggests a right end organ or nerve terminal lesion" (Tr. 139).

---

[26]An ENG test records changes in the corneoretinal potential resulting from eye movements, documenting involuntary movement of the eyeball.  <u>Dorland's Illustrated Medical Dictionary</u>, 609, 1327 (31st ed. 2007).

Plaintiff had an audiogram at Professional Hearing Services on April 9, 1997 (Tr. 467). The evaluative summary noted that he had been diagnosed with Meniere's disease and had experienced vertigo for the past year as well as gradual hearing loss over the past few years (Tr. 467). The exam showed clear external ear canals and normal tympanometry (Tr. 467). Pure tone testing revealed mild-to-moderate sensorineural hearing loss on both sides (Tr. 467). Plaintiff had good speech discrimination scores for both ears at the average conversational level (Tr. 467). The audiologist stated that plaintiff had "expressed his frustration with listening to conversation due to his hearing impairment" and that he counseled plaintiff about hearing aids (Tr. 467).

On June 26, 2003, plaintiff underwent an audiological evaluation at the Professional Hearing Center (Tr. 577). The report, by audiologist Joy F. Dittenhoefer, noted that plaintiff has a history of vertigo, Meniere's disease and noise exposure (Tr. 577). It stated that plaintiff reported worsening of his hearing, particularly when watching television, on the phone and in crowded rooms (Tr. 577). It noted that plaintiff had never tried hearing aids or assistive listening devices (Tr. 577). This test showed "a mild sloping to moderately severe sensorineural hearing loss, bilaterally" (Tr. 577). The report

noted excellent speech discrimination (100%) in both ears (Tr. 577).

    7.  Proceedings
        Before the ALJs

        a.  April 2, 1998 Hearing
            Before ALJ Gibbons

    At the administrative hearing before ALJ Gibbons on April 2, 1998, plaintiff testified to the following facts. Plaintiff reported that he attended school through part of the 12th grade and then obtained a G.E.D. (Tr. 26). He stated that he worked as a tire mechanic starting in March 1983 and also worked at various times as a building maintenance person, stock person, truck washer and building manager (Tr. 26). Plaintiff testified that he last worked in 1991, but that he worked for himself doing side jobs in 1994 (Tr. 25, 28). He acknowledged that he had no earnings or tax records for 1991 (Tr. 40).

    Plaintiff confirmed that he was alleging disability due to Meniere's disease and stated that his Meniere's symptoms had been present for years -- although he initially thought they were normal occurrences that everyone experiences once in awhile (Tr. 27). He stated at one point that he was diagnosed with Meniere's disease the year before the hearing, which would be 1997 (Tr. 27), but later stated he was diagnosed in 1996 (Tr. 38). He noted that Dr. Fontanez was his primary physician at the time and

55

that he also had seen Dr. Shah and Dr. Kuderov, who were special-
ists (Tr. 27, 37).  Plaintiff also testified that he started
treatment for depression in September 1997 (Tr. 43).  Plaintiff
reported that he was taking Amitriptyline, Acetazolamide, Hydro-
chlorothiazide, Loxitane, "Amphetapine," Clonazepam, Meclizine
and Prozac (Tr. 27-28).  He was not on any medication, however,
before July 1995 (Tr. 28).

        Plaintiff testified that he would sometimes pass out,
have high blood pressure and feel dizzy (Tr. 28).  He stated
that, as early as 1994, he would collapse and feel that the world
was spinning (Tr. 28).  Once or twice a week he got an attack
lasting two or three days in which he perceived that everything
around him was spinning uncontrollably (Tr. 36).  When he experi-
enced this, he got to the ground immediately (Tr. 36).  He did
not use an assistive device like a cane or crutch but just relied
on walls for balance (Tr. 35). Plaintiff stated that although he
did some minimal yard work, he usually slept the day away or
spent it on the couch with his eyes closed because of a constant
nauseous feeling, an extremely loud ringing in his ears and a
general unsteadiness (Tr. 35).  Plaintiff testified that he did
not tell anyone about the dizzy spells before then because his
job would not allow him any leave time for illness and he had
difficulty with his supervisor, who was an alcoholic (Tr. 39).

b.  Hearings Before
ALJ Zolezzi[27]

i.  March 16, 2001
Hearing

Another hearing was held on March 16, 2001 before ALJ

Thomas P. Zolezzi (Tr. 234, 236).  Plaintiff was represented by

attorney Irwin Portnoy; plaintiff's wife was also present (Tr.

236).  At the hearing, plaintiff testified that he attended

school through twelfth grade but did not complete it, and later

went back for a G.E.D. (Tr. 240).  He identified his conditions

as Meniere's disease, anxiety and high blood pressure (Tr. 240).

He noted that he felt uncomfortable being up high -- for example,

one time when he climbed a stepladder to retrieve a frisbee from

the roof, he felt unsteady and as if he was rotating in one

_____

[27]In addition to conducting two hearings, ALJ Zolezzi
solicited evidence from Dr. Maurice T. Gromet, a prospective
medical expert (Tr. 343-45).  He sent Dr. Gromet the medical
records in plaintiff's file and a set of interrogatories (Tr.
343-45).  However, plaintiff objected to the use of these
interrogatories, claiming, among other things, that Dr. Gromet
did not have an active medical license and that the ALJ's method
of soliciting evidence would provide no opportunity for cross-
examination (Tr. 358, 378, 905).  Although Dr. Gromet declined to
provide answers to the ALJ's specific interrogatories or to
complete a form ALJ Zolezzi sent him entitled "Medical Source
Statement of Ability to Do Work-Related Activities," the record
does include a letter from Dr. Gromet setting forth his opinion
based on plaintiff's medical records (Tr. 356, 387-94).  However,
neither ALJ Zolezzi nor ALJ Farrell appears to have relied on Dr.
Gromet's opinion in their decisions (see Tr. 224-33, 633-48).

direction (Tr. 241).  He stated that he normally avoided driving (Tr. 241-42).

Plaintiff described his job responsibilities for several of his past positions[28] (Tr. 242-45).  In his most recent position as an assistant building manager for Capelli Development, he worked from about 6:00 a.m. to 9:00 p.m., six days a week, and his employer was not willing to reduce his hours (Tr. 263).  Plaintiff stated that he ultimately quit that job because his boss refused to cut his hours (Tr. 263).  He stated that his past jobs involved a lot of noise coming from heavy equipment, machinery, and air conditioners and that he never wore ear protection (Tr. 264).  Plaintiff reported that from 1991 to 1993, he worked for himself doing odd jobs like yard work and home repair (Tr. 244-45).  About half the time, dizziness and vertigo would prevent plaintiff from being able to complete the jobs (Tr. 245).  In December 1994, plaintiff stopped being able to work entirely because of dizzy spells that occurred three or four times a week and his tendency to pass out occasionally (Tr. 244).  He testified that this had been going on for awhile, but got worse in December 1994 (Tr. 244).  Even before 1994, he would have unpredictable dizzy spells that made him feel as if he were about to pass out (Tr. 265-66).  The episodes happened, he

---

[28]The information plaintiff relayed in his testimony about his previous job duties is included above in subsection II.B.

stated, around three times a week and lasted around six or seven hours (Tr. 266).  Plaintiff stated that he had not worked at all since December of 1994 (Tr. 252).

Plaintiff testified that he did not see a doctor between 1991 and 1994 because of a fear of doctors based on his memories of his grandmother dying of cancer under the care of doctors when he was twelve (Tr. 245-46).  Plaintiff admitted that between the ages of 12 and 31 he saw physicians only in emergency situations such as a cut on his finger or a foot injury due to stepping on a nail (Tr. 246).  Plaintiff stated that in 1995 his wife forced him to go to a doctor after what he described as a particularly bad panic attack (Tr. 246).  He saw Dr. Schwartz at the Clocktower Commons in Brewster, New York, who told him his blood pressure was very high and he was close to a heart attack (Tr. 246-47).  In 1996 plaintiff switched to seeing Dr. Fontanez, a general practitioner at Community Health Plan, because of a move and change of insurance (Tr. 247).  Plaintiff stated that he also saw Dr. Kucherov, a neurologist at Community Health Plan (Tr. 249) and that for a period starting in January 1997 he was seeing Terri Hershowitz, a therapist at Community Health Plan, primarily for anger management (Tr. 250-51).  Plaintiff also saw Dr. Shah, a neurologist, who would administer tests involving plaintiff's ears and vision (Tr. 252).

Plaintiff stated that his symptoms were unsteadiness, nausea, and a tendency for everything in his vision to turn in one direction, usually counterclockwise (Tr. 251). He testified that the dizziness lasted for hours, kept him off his feet for two or three days and felt similar to the type of head rush one gets from standing up quickly -- but lasting for a very long period of time (Tr. 251-52). The episodes came out of the blue without warning (Tr. 252). He stated that for the nausea he liked to lay his head to one side on the couch (Tr. 251). He also stated he experienced a high-pitched fluctuating tone in his ears (Tr. 267). He stated that the noise inhibited his ability to maintain attention and concentration (Tr. 267). He was on several medications but stated that he did not think they were helping him, as he was still nauseous and still experienced attacks (Tr. 253-54). Plaintiff acknowledged that the medications might slow down the attacks, but stated that they did not prevent them (Tr. 254). He stated that he experienced side effects including significant weight gain and the need to urinate constantly (Tr. 269). He stated that he frequently woke up several times during the night, usually to urinate as a result of the diuretics but sometimes because of an anxiety attack (Tr. 261).

Plaintiff stated that in general, he could stand and walk for about an hour before feeling that he had to lay down

(Tr. 254-55).  He stated that even when sitting, he felt nauseous
but that he never actually vomited (Tr. 255).  He testified that
he would not be able to do an office job even if he were able to
sit for most of the day, because he would have to lie down after
an hour (Tr. 266).  Plaintiff stated that he always squatted if
he needed to pick something up because if he bent over he got an
attack when the blood rushed to his head (Tr. 255).  He stated
that he had the physical ability to lift at least 40 pounds, but
that the dizziness sometimes interfered with what he was able to
do (Tr. 255).  Plaintiff also reported that he had carpal tunnel
syndrome in his left hand, for which he had had surgery in 1993
(Tr. 256).  He stated that he did not discuss his dizziness with
the doctor who treated his carpal tunnel, because he thought it
was "just dizzy" (Tr. 257).

        Plaintiff stated that he was able to bathe and dress
his own and had developed methods of accomplishing tasks like
tying his shoes without bending over (Tr. 262).  He had two
handicap rails installed in his shower and never showers while he
is having an attack (Tr. 262).  He stated that his condition
would not prevent him from shopping with his wife, though he did
not do it, and that he did help her carry groceries in when she
got home (Tr. 257).  He did a little bit of the cooking -- hot
dogs two nights a week (Tr. 258).  He could not vacuum because
the noise caused him pain (Tr. 258).  He was able to do laundry,

but instead of bending over to transfer the clothes he squatted (Tr. 258-59).  He did not do any outdoor work (Tr. 259).  Plaintiff reported that he never went out or spent time on hobbies anymore, as all of his hobbies required power tools (Tr. 259-60).  He stated that in a typical day, he got the kids off to school, went back to sleep on the couch until around ten, eventually would go to get the mail at the end of the driveway about 40 feet away, would take the dog to the back yard, then would go back to the couch unless the kids needed him for homework (Tr. 260).  The only time he spent with his children was sitting inside with them (Tr. 261).  He stated he did not enjoy being in crowds, but suggested that this was not necessarily related to his impairments (Tr. 261-62).

Plaintiff stated that he had had some dizziness since he was a child, when he would sometimes get out of bed and be so dizzy he had to get back in, but that his family thought it was the flu (Tr. 264).  He also testified that he had banged his head several times -- once on a wooden beam in his basement in 1996 and multiple times on cars during his job as a tire engineer from 1982 to 1983 (Tr. 268-69).  He stated further that he had had nighttime panic attacks starting before 1994 (Tr. 267).

In addition, Mrs. Kruppenbacher testified to the following facts.  She stated that plaintiff had been experiencing dizziness for a long time and did not like to see doctors (Tr.

270-71).  Mrs. Kruppenbacher also testified that she had been
afraid to have plaintiff see a doctor for a long time because
there was high blood pressure on both sides of his family (Tr.
272).  She acknowledged that plaintiff had an outpatient carpal
tunnel procedure after experiencing excruciating pain in the
middle of the night and stated that this occurred in 1991 (Tr.
271).  She recalled that it involved at least two doctor's visits
(Tr. 272).

     She stated that she remembered plaintiff complaining of
being dizzy and nauseous as far back as 1983 or 1984, but that it
had gotten worse by the time he went to see a doctor about it
(Tr. 272).  Plaintiff got dizzy about three or four times a week,
but would not complain and Mrs. Kruppenbacher would have to ask
him what was wrong (Tr. 273).  These episodes would last at least
a few hours and plaintiff would lie down and close his eyes (Tr.
274).  She testified that plaintiff did some odd jobs, mostly
carpentry work, that he obtained through word of mouth (Tr. 273-
74).  He would not always complete the job and when he did finish
it would often take him much longer than it should have (Tr.
274).  She stated that he took these jobs in an attempt to
contribute to the household (Tr. 274).  Mrs. Kruppenbacher stated
that plaintiff would interact with the children but was very
sensitive to the noise when they were loud (Tr. 275).

ii.   July 18, 2001
<u>Hearing</u>

On July 18, 2001, ALJ Thomas P. Zolezzi held an addi-
tional hearing at which he called a medical expert (Tr. 277-79).
Dr. Christopher Nash, an ear, nose and throat specialist (Tr.
283), testified to the following.[29]  He noted that, based on
reviewing the file, plaintiff had dizziness, headaches and panic
attacks (Tr. 285).  Dr. Nash described Meniere's disease as an
"offshoot of a kind of twitchy nervous system [involving]
[h]ypersensitivity of the neurons" and stated that it can have a
sudden onset (Tr. 287).  He stated that hypertension was not
particularly associated with Meniere's (Tr. 289).  He stated that
he sees an instance of Meniere's disease about weekly (Tr. 283).

Dr. Nash opined that plaintiff <u>could</u> have had Meniere's
disease before December 1994 (Tr. 286-87).  Specifically, when
asked "From your reading of the records and your medical exper-
tise concerning Meniere[']s, in your medical opinion with any
sort of medical certainty, could [plaintiff] have had Meniere[']s
disease prior to December of 1994?" Dr. Nash answered "Could he
have had, yes" (Tr. 287).  However, he stated that based on his
reading of the file there were no "objective findings that show
[plaintiff] <u>did</u> have it prior to 1994" (Tr. 287) (emphasis

---

[29]The ALJ also solicited interrogatories from Dr. Nash (Tr.
400), but the record does not appear to contain any completed
interrogatories or response of any kind.

64

added).  He acknowledged that Dr. Shah's report stated that
plaintiff had dizziness in his teens and twenties, but also noted
that this was not an objective finding but rather was based on
plaintiff's subjective statements (Tr. 287).  When asked "can
you, from what you saw in the records, make any sort of a medical
determination with any certainty that [plaintiff] had this
problem prior to December 31st, 1994, to such a degree that he
would not be able to work, he would have been disabled?" Dr. Nash
responded that "[t]here was no documentation for that" (Tr. 288).
He also stated, however, that if he were seeing a patient himself
and the history provided by the patient supported Meniere's
disease, he could make a finding with medical certainty that the
patient had had Meniere's starting at a prior point in time (Tr.
293).

        Dr. Nash stated that based on his reading of the
records, the first date plaintiff would have been disabled would
have been sometime in 1995 (Tr. 288).  He stated further that
there was no period of time for which the objective findings
would indicate that plaintiff was "totally disabled," and that
generally Meniere's patients can cope with the disease given
proper medication (Tr. 288-89).  He also noted that plaintiff had
responded to the medication he was prescribed for his Meniere's
symptoms (Tr. 288).  He stated that it would be possible, but
"very unlikely," for a patient experiencing such extreme symptoms

                                 65

to avoid seeing a doctor and seeking treatment (Tr. 291).  He stated that "with [v]ertigo it feels like you're dying" and opined that a vertigo sufferer "would seek some kind of help" (Tr. 291).

Dr. Nash did state, however, that based on the ENG test results from March 24, 1997 (Tr. 139), plaintiff would have met listing 2.07 (for disturbance of labyrinthine-vestibular func-tion, including Meniere's disease) of 20 C.F.R. Part 404, Subpart P, Appendix 1 at the time the test was performed -- though there were no records to show he would have met the listing at any earlier point (Tr. 290).  Dr. Nash stated that, because of the lack of medical records from 1994 or before, he could not agree or disagree with Dr. Fontanez's opinion that plaintiff's symptoms existed before 1994 (Tr. 292).

### c.  Hearings Before ALJ Farrell

#### i.  April 24, 2006 Hearing

On April 24, 2006, ALJ Terence Farrell held a hearing at which Dr. Aaron Satloff, medical expert, and Mrs. Kruppenbacher testified (Tr. 667, 901-03).  Dr. Satloff, a psychiatrist, opined that as of December 1994 plaintiff had Meniere's disease and PTSD due to being abused as a child (Tr. 913).  He based his opinion regarding Meniere's on the fact that

66

Dr. Fontanez "[h]ad been treating him for it" (Tr. 928).  He
stated he did not "know" that plaintiff had PTSD as of that date,
but that it would make sense because the events giving rise to
the condition occurred before that date (Tr. 913-14).  He noted
that there was no evidence in the record that would shed light on
the severity of plaintiff's PTSD prior to 2001 (Tr. 915).
Regarding the general progression of PTSD, he testified that the
disorder "remains latent until something brings it out" and then
tends to stay constant until treated, causing chronic symptoms
such as anxiety, despondency, difficulty concentrating and
suicidal thoughts (Tr. 915-16).  He suggested that he was not
aware of any events, based on his review of the record, that
would have brought out plaintiff's PTSD (Tr. 915), but noted that
plaintiff had a long history of recurring suicidal ideation and
tentatively attributed this to plainitff's PTSD (Tr. 916).  He
also testified that PTSD may involve flashbacks to the initial
traumatic incident and can cause hypervigilance, meaning the
sufferer is easily startled and anxious (Tr. 917).

        Dr. Satloff opined that as of 1994, none of plaintiff's
impairments, either individually or in combination, were severe
enough to meet or equal any of the listed impairments (Tr. 917).
He testified that he could not unequivocally state whether
plaintiff had any limitations with regard to work as of December
1994 (Tr. 918).  He testified, however, that he did believe

plaintiff's conditions of PTSD and personality disorder not
otherwise specified met or equaled the listed impairments as of
September 20, 2001, the time of Dr. Gindes' evaluation (Tr. 917-
18).

Dr. Satloff opined that plaintiff's Meniere's symptoms
were not chronic over the long term, based on Ms. McLain's notes
from April 7, 1997 stating that plaintiff was advised that his
Meniere's would prevent him from being able to work for a period
of time, that he was given resources on job retraining and that
plaintiff was hopeful he would be able to resume working at some
point (Tr. 918).  He testified that any difficulty plaintiff
would have at work would mostly likely result from personality
disorder (manifesting in anger and inability to get along with
others) rather than PTSD (Tr. 922).  Dr. Satloff stated that
plaintiff's behavior of verbal altercations with his boss and
punching and breaking objects to release his anger could be
attributed to personality disorder (Tr. 925).  He opined that,
based on Mrs. Kruppenbacher's October 17, 2001 statement, plain-
tiff was stressed by his boss and that the stress probably
exacerbated his Meniere's disease (Tr. 924).  Dr. Satloff could
not say whether the work-related stress would have affected
plaintiff's PTSD (Tr. 925).  He stated that plaintiff's thoughts
of suicide while working on the roof of an office complex build-
ing could be a symptom of both depression and PTSD (Tr. 926).

Dr. Satloff opined that plaintiff's difficulties with concentration and attention could have made it difficult for him to maintain any occupation before 1994, but also that he could potentially do sedentary work that did not have a lot of potential for conflict with coworkers (Tr. 926). He specified a sedentary job because of plaintiff's vertigo and dizziness resulting from Meniere's disease (Tr. 927-28). Dr. Satloff stated that "if you're on those scaffolds and if you move your head right quickly, Meniere's people can't do that because of the fluid in the semi-circular canals in the ears, it starts firing off biologic impulses and they can have an attack of vertigo, nausea and dizziness" (Tr. 928). He also opined that plaintiff would be capable of working in a "more nurturing, less conflict laden environment, without any question" and that he appeared motivated to return to work based on the April 7, 1997 note from Ms. McLain (Tr. 927). Dr. Satloff admitted, however, that vocational expertise was not his "forte" (Tr. 926-27).

Mrs. Kruppenbacher also testified at this hearing. She stated that plaintiff started working at age 16 as a tire mechanic, that he next worked at a maintenance mechanic at a building in White Plains and that he then moved to Capelli Development (Tr. 932-33). Mrs. Kruppenbacher described plaintiff's boss at Capelli Development as maniacal and unreasonable and stated that he would not let plaintiff take time off, even to

attend the birth of their daughter (Tr. 934).  She testified that she convinced him to leave that job because of his health, including stress and dizziness issues, and that he finally resigned (Tr. 934, 939).

Mrs. Kruppenbacher stated that plaintiff had always experienced dizziness and had been getting headaches since the late 1970s (Tr. 934).  She reported that he got a headache with nausea around twice a week (Tr. 934).  She testified that when he experienced a headache his ears would get red, he would get anxious and then he would get dizzy (Tr. 936).  She said the episodes would last anywhere between two hours and most of the day (Tr. 936).  When asked what brought on the dizziness and headaches, Mrs. Kruppenbacher responded that they could be set off by anything (Tr. 939).  She testified that the symptoms got worse over the years (Tr. 941).  She stated that plaintiff rarely drove, and that driving with him is not only dangerous because of his Meniere's disease but unpleasant because he gets irrationally angry at other drivers (Tr. 937).

Mrs. Kruppenbacher testified that leaving his job at Capelli development did not help plaintiff's symptoms (Tr. 934-35).  She stated that between 1991 and 1994 there was no improve-ment and that during that time plaintiff experienced headaches and dizziness at least once or twice a week (Tr. 935).  Mrs. Kruppenbacher testified that neighbors suggested he see a doctor

70

(Tr. 936) but that it was nearly impossible to get plaintiff to go (Tr. 940).  She stated that he finally saw a doctor around 1992, during a spell when he had been dizzy for several days (Tr. 940).  It was ultimately at the urging of a neighbor that they went (Tr. 940).  The doctor told him his blood pressure was so high it was approaching stroke level (Tr. 940).  Plaintiff got treatment for his high blood pressure, but it did not help the dizziness (Tr. 940).  Eventually, she stated, they saw another doctor for the dizziness a few years later (Tr. 940-41).  She stated that plaintiff had been most helped by Dr. Levine (Tr. 941).

Mrs. Kruppenbacher stated that plaintiff did look for a new job after leaving work in 1990, but that it was hard to find one (Tr. 941).  She testified that he did not consider getting vocational retraining because he did not deal well with structured environments like school (Tr. 941-42).  She also stated that it was helpful to have him at home (Tr. 941; see Tr. 943). She testified that he stopped looking for work around 1997 once they learned the severity of his Meniere's disease (Tr. 942). She explained that plaintiff would not have been able to function in an office environment working eight hours a day, five days a week, nor would he be able to function in a job doing assembly work, partly because he could not work for eight hours straight

but could only do a task for around an hour at a time (Tr. 943-
44).

### ii.  August 10, 2006
#### Hearing

On August 10, 2006, ALJ Terence Farrell held a supple-
mental hearing at which plaintiff and Dr. Satloff testified (Tr.
686, 949-51).  Dr. Satloff repeated his testimony that plaintiff
probably -- to a reasonable degree of medical certainty -- had
PTSD in December 1994 (Tr. 953).  He testified that symptoms
associated with PTSD are hypervigilance, irritability, flashbacks
of traumatic incidents, nightmares, anxiety and depression (Tr.
954).  He denied that PTSD might lead plaintiff to avoid seeking
medical treatment for other problems (Tr. 956).

Dr. Satloff testified that to a reasonable degree of
medical certainty, plaintiff's PTSD would have given him diffi-
culty concentrating, remembering instructions and carrying out
repetitive or repetitious tasks in 1994, but testified that those
limitations would not have prevented plaintiff from working at
all (Tr. 954).  In his opinion, plaintiff would be precluded from
working in positions that required high concentration, rapid
performance or abrupt changes in routine (Tr. 955).  He also
reiterated his prior testimony that plaintiff would have done
best in a nurturing or accommodating work setting, meaning a
supportive environment rather than a workplace in which there was

an adversarial relationship between supervisors and employees
(Tr. 955).  He stated, however, that this did not mean plaintiff
would have to be in a "sheltered workshop" or other setting
outside of competitive employment (Tr. 956).

　　　　　Dr. Satloff acknowledged that Dr. Rubin's report
reported a performance I.Q. score of 81 (Tr. 958) and that such a
score could vary by as much as five points in either direction
(Tr. 958-60).  He testified that if the 81 performance I.Q. were
five points lower, it "could" impose an additional limitation on
plaintiff's ability to perform in a normal workplace and also
acknowledged that I.Q. normally remains relatively constant
throughout life (Tr. 960-61).  He testified that he thought
plaintiff's true I.Q. was 91, based on the report of a score of
91 on the full-scale I.Q., not 81 or 76 as plaintiff's represen-
tative suggested (Tr. 964, 966).  When questioned, he doubted
that a full-scale I.Q. of 76, combined with plaintiff's personal-
ity disorder and PTSD, would operate to meet or equal an impair-
ment listed in the regulations (Tr. 965-66).

　　　　　Dr. Satloff testified that, in addition to PTSD,
plaintiff had a personality disorder as of 1994 because personal-
ity disorders are generally lifelong (Tr. 967).  He described a
personality disorder with avoidance features as a "maladaptive"
condition, but one that would not necessarily provoke anxiety,
and stated that it could involve traits of paranoia, suspicious-

ness and antisocial behavior (Tr. 964).  He noted that a person-
ality disorder was not considered an acute disorder, but rather
"a description of the person's adaptation and personality orien-
tation toward life" (Tr. 964).

          Plaintiff also testified at the August 10, 2006 hear-
ing.  Much of his testimony described his job with Capelli
Development (Tr. 968-76).[30]  He testified that in his position as
building manager, he did the maintenance for a two-building,
four-story office complex, including air conditioning, refrigera-
tion, heating and ventilation, as well as answering tenant
complaints (Tr. 968).  He stated that he supervised a crew of
five men (Tr. 968).  Plaintiff described Howard White, his boss
at Capelli Development, as "a very demanding alcoholic going
through a nasty divorce" (Tr. 972).  He stated that Mr. White
would frequently call him from home during the day when he was
supposed to be at work and that he once had to save Mr. White
from being beaten with baseball bats by his children (Tr. 972-
73).  He stated that Mr. White took his lunch breaks at the bar
and that he would frequently have to cover for Mr. White about
where he was (Tr. 973).  He described Mr. White as "a liar, a
cheat, and a thief" and stated that he destroyed company prop-

---

[30]Plaintiff also testified at this hearing about the work he
did as a building engineer for Odyssey Maintenance Corporation
before the job at Capelli Development (Tr. 978-79).  This
testimony is reflected in subsection II.B above.

erty, telling plaintiff that if plaintiff reported it, plaintiff
would lose his job (Tr. 973).  Plaintiff stated he could not take
this and that up to three times a week he would go find a place
to sleep and hide for an hour or two (Tr. 973).  Plaintiff also
stated that Mr. White would call him around 11 p.m. to come in
and do work that the night crew was supposed to be doing (Tr.
974).

Plaintiff stated that while working at Capelli Develop-
ment he had constant heartburn and was often nauseous and dizzy
(Tr. 976).  When he told Mr. White he felt dizzy, Mr. White would
tell him to just sit down for a few minutes, and would never let
him see a doctor (Tr. 970-71, 976).  Mr. White would not even
allow plaintiff time off work to attend the birth of his daughter
(Tr. 974).

Plaintiff stated that he was fired from the job when he
refused to obey Mr. White's order to clean Mr. Capelli's mansion
in Montauk on a Saturday when he needed to take one of his
children to a pediatrician[31] (Tr. 974).  Although plaintiff was
initially told he could apply for unemployment insurance, Mr.
Capelli's daughter later warned him not to challenge his denial

---

[31]At an earlier hearing, plaintiff testified that he
voluntarily left Capelli Development because they refused to
reduce his hours (Tr. 263).  His wife also testified that he
resigned from his position at Capelli (Tr. 934, 939).

(Tr. 974-75).  Plaintiff stated that he was also threatened by Mr. Capelli the year before that (Tr. 975).

Plaintiff testified that he last worked at Capelli Development in 1990 or 1991 and that he did not do any odd jobs or other paid work after that (Tr. 968).  He stated that he looked for other formal work after leaving Capelli Development, but no one was hiring and he had been "blackballed" by Capelli (Tr. 969).  He stated that Mr. Capelli owns the police depart-ment, owns everything that happens in Mt. Pleasant and is "God" in Westchester (Tr. 972).  Plaintiff stated that he did not make a "conscious decision" not to go back to work, but that he made no attempt to find an alternative line of work because he did not know any other work (Tr. 969-70).  He stated that a nurse or doctor did tell him job retraining was available, but that he did not pursue it because he felt limited by his education and the range of what he felt comfortable doing (Tr. 970).

Plaintiff's recollections from the initial years he was not working involved time with his children, who were six and seven years old at the time, and "a lot of dizziness, a lot of nauseous, and a lot of time on the couch" (Tr. 971).  He stated he was not involved in any activities outside the home, either connected to his children or otherwise (Tr. 971).  He testified that he had constant heartburn during this time (Tr. 976-77).  He stated that he had dizzy episodes weekly, that they would last

76

through the night, up to two days, and that they were still
occurring (Tr. 977).

iii.   January 22, 2007
<u>Hearing</u>

On January 22, 2007, ALJ Terence Farrell held a supple-
mental hearing at which plaintiff and Dr. Peter Manzi,[32] a voca-
tional expert, testified (Tr. 710, 982-84).  Plaintiff testified
that he finished the 11th grade and later obtained a G.E.D., and
that he had no formal schooling or vocational training after that
(Tr. 988).  He also testified about his job duties in the various
positions he has held[33] (Tr. 988-98).

Dr. Manzi testified that plaintiff's job as a janitor
involves a "medium" level of work, is semi-skilled, and was
performed by plaintiff at a light to medium level (Tr. 999).  He
testified that the position of bus or truck cleaner, another of

---

[32]Plaintiff objected to ALJ Farrell's use of Dr. Manzi's
testimony, claiming, among other things, that he was not a
legitimate expert (Tr. 722, 738, 994).  ALJ Farrell appears to
have denied plaintiff's objections, as he relied on Dr. Manzi's
testimony in his decision.

After the hearing, Dr. Manzi also provided a table of wage
data for the Hudson Valley Region (Tr. 733-37).  The table lists
various positions, the numbers in which those positions exist in
the region, the mean and median annual wages for those positions,
and the annual wages broken down by entry level and experience
(Tr. 735-37).

[33]This testimony is reflected in the description of
plaintiff's work history in subsection II.B above.

plaintiff's previous positions, is medium and unskilled and was performed at a light to medium level (Tr. 1000).  He testified that the position of tire changer (including someone who changes oil and checks fluids) is medium and unskilled and was also performed by plaintiff at a medium level (Tr. 1000).  He testified further that the position of hand packager (corresponding to plaintiff's job stocking perfume) is medium, unskilled, and was performed by plaintiff at a light level (Tr. 1000-01).

When asked by ALJ Farrell about a hypothetical individual who was between the ages 31 and 43, had a G.E.D., and had performed plaintiff's past work, Dr. Manzi provided testimony on what type of work such a person would be able to perform given various combinations of additional limitations.  He testified that if the person had no exertional limitations but had to avoid exposure to workplace hazards like heights and dangerous machinery, and was limited to unskilled or semi-skilled work that did not require high levels of concentration, rapid performance or abrupt changes in work routines, and could not work in a setting with close supervision (Tr. 1001-03), that person would be able to do one of plaintiff's past relevant jobs, namely the hand packager position, and that the hypothetical person would be able to perform it either as defined in the Dictionary of Occupational Titles ("DOT") or as plaintiff actually performed it (Tr. 1003).

The positions of tire changer and maintenance worker were ruled out because of hazards like climbing ladders (Tr. 1003).

With the same limitations as well as the additional limitation of being able to lift, carry, push or pull 20 pounds only occasionally, the ability to lift, carry, push or pull 10 pounds frequently, the ability to stand or walk six hours of the workday with normal breaks and the ability to sit for six hours in a workday with normal breaks (Tr. 1003), Dr. Manzi testified that the person would be able to perform the past relevant work of hand packager as plaintiff performed it (at the light level), but not as defined in the DOT, where it is described as medium work (Tr. 1003-04).  Dr. Manzi testified that the definition of hand packager does not contain any performance requirements, deadlines, or "stress requirements" (Tr. 1008).

Assuming the same limitations except that the hypothetical person could lift, carry, push or pull ten pounds only occasionally, but could frequently lift, carry, push or pull less than ten pounds, and could stand or walk only two hours in a workday, Dr. Manzi testified that the person would not be able to perform any of plaintiff's past work (Tr. 1004).  However, he stated that such a person could perform occupations that were sedentary and unskilled (Tr. 1005-06).  Such positions included telephone quotation clerk, charge account clerk, addresser, general assembler and table worker -- all of which existed in the

national economy and Hudson Valley region (Tr. 1005-06).  Dr. Manzi testified that if the person could not be exposed to noise, the general assembly job would be ruled out but the others could still be performed (Tr. 1019).

Dr. Manzi also testified about the work capabilities of a hypothetical person described by plaintiff's counsel (Tr. 1017-19).  Plaintiff's counsel asked Dr. Manzi to consider an individual with the same age, education and work background as plaintiff, who also:  (1) had unpredictable panic attacks daily which required him to rest for thirty to sixty minutes, (2) experienced dizziness causing an inability to focus ranging anywhere from 30 minutes to three days, (3) had a problem working closely with others, (4) could not be exposed to noise, (5) needed a bathroom nearby due to the need to urinate about every forty minutes, (6) had problems remembering numbers, (7) had pain in one hand, (8) could not move his head quickly, (9) needed a "nurturing" environment that was almost free of conflict, (10) had difficulty dealing with the public, with a lot of different coworkers and with deadlines, (11) might have trouble learning new tasks and (11) was not likely to relate well to others or deal well with stress due to considerable rage (Tr. 1017-18).

Dr. Manzi stated that given all these characteristics, all of plaintiff's past occupations would be ruled out due to the necessity for frequent interruptions in the work schedule (Tr.

1019).  Dr. Manzi acknowledged that any job requires a signifi-
cant level of attention or concentration (Tr. 1020).

III.  Analysis

    A.  Applicable Legal
        Principles

        1.  Standard of Review

          The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008);
Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v.
Chater, 221 F.3d 126, 131 (2d Cir. 2000); Tejada v. Apfel, 167
F.3d 770, 773 (2d Cir. 1999); Bubnis v. Apfel, 150 F.3d 177, 181
(2d Cir. 1998).  The term "substantial evidence" has been defined
as "'more than a mere scintilla.  It means such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion.'"  Perez v. Chater, supra, 77 F.3d at 46, quoting
Richardson v. Perales, 402 U.S. 389, 401 (1971); accord Burgess
v. Astrue, supra, 537 F.3d at 127-28; Halloran v. Barnhart, 362
F.3d 28, 31 (2d Cir. 2004); Veino v. Barnhart, supra, 312 F.3d at
586; Tejada v. Apfel, supra, 167 F.3d at 773-74; Quinones ex rel.
Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997).

> The reviewing court does not conduct a <u>de novo</u> review
> as to whether the claimant is disabled, <u>Parker v.
> Harris</u>, 626 F.2d 225, 231 (2d Cir. 1980), nor may it
> substitute its own judgment for that of the Commis-
> sioner.  <u>Jones v. Sullivan</u>, 949 F.2d 57, 59 (2d Cir.
> 1991); <u>Valente v. Sec'y of Health & Human Servs.</u>, 733
> F.2d 1037, 1041 (2d Cir. 1984).  When the Commis-
> sioner's decision is not supported by substantial
> evidence, a reviewing court must reverse the adminis-
> trative decision because "the entire thrust of judicial
> review under the disability benefits law is to insure a
> just and rational result between the government and a
> claimant . . . ."  <u>Williams ex Williams v. Bowen</u>, 859
> F.2d 255, 258 (2d Cir. 1988).

<u>Lee v. Apfel</u>, No. CV 99-2930 (LDW), 2000 WL 356411 at *2

(E.D.N.Y. Apr. 3, 2000); <u>see</u> <u>Veino v. Barnhart</u>, <u>supra</u>, 312 F.3d

at 586 ("Where the Commissioner's decision rests on adequate

findings supported by evidence having rational probative force,

we will not substitute our judgment for that of the Commis-

sioner.").  Moreover, the Commissioner's decision must be af-

firmed if it is supported by substantial evidence, even if there

is also substantial evidence supporting plaintiff's position.

<u>Persico v. Barnhart</u>, 420 F. Supp. 2d 62, 71 (E.D.N.Y. 2006),

<u>citing</u> <u>Jones v. Sullivan</u>, 949 F.2d 57, 59-60 (2d Cir. 1991).

"Reversal and entry of judgment for the claimant is

appropriate only 'when the record provides persuasive proof of

disability and a remand for further evidentiary proceedings would

serve no purpose.'"  <u>Cruz ex rel. Vega v. Barnhart</u>, 04 Civ. 9794

(DLC), 2005 WL 2010152 at *8 (S.D.N.Y. Aug. 23, 2005) (Cote,

D.J.), <u>modified</u> <u>on</u> <u>other</u> <u>grounds</u> <u>on</u> <u>reconsideration</u>, 2006 WL

547681 (S.D.N.Y. Mar. 7, 2006), quoting Parker v. Harris, 626
F.2d 225, 235 (2d Cir. 1980); accord Rivera v. Sullivan, 923 F.2d
964, 970 (2d Cir. 1991); Babcock v. Barnhart, 412 F. Supp. 2d
274, 284 (W.D.N.Y. 2006); Buonviaggio v. Barnhart, No. 04 CV 357
(JG), 2005 WL 3388606 at *5 (E.D.N.Y. Dec. 2, 2005); Rivera v.
Barnhart, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005) (Marrero,
D.J.); see 42 U.S.C. § 405(g) ("The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing.").

       2.  Determination of
           Disability

     Under Title II of the Social Security Act, 42 U.S.C.
§§ 401 et seq., a claimant is entitled to disability benefits if
he or she can establish an inability "to engage in any substan-
tial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to . . . last
for a continuous period of not less than 12 months."  42 U.S.C.
§§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535
U.S. 212, 217-22 (2002) (both impairment and inability to work
must last twelve months).  The impairment must be demonstrated by
"medically acceptable clinical and laboratory diagnostic tech-
niques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable
> to do his previous work but cannot, considering [the
> claimant's] age, education, and work experience, engage
> in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether
> such work exists in the immediate area in which [the
> claimant] lives, or whether a specific job vacancy
> exists for [the claimant], or whether [the claimant]
> would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  In addition, to

obtain disability benefits, the claimant's disability must have

commenced prior to the expiration of his or her insured status.

20 C.F.R. §§ 404.130, 404.315; 42 U.S.C. § 423(c); Arnone v.

Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989).

"In evaluating disability claims, the [Commissioner] is

required to use a five-step sequence, promulgated in 20 C.F.R.

§§ 404.1520, 416.920."  Bush v. Shalala, 94 F.3d 40, 44 (2d Cir.

1996).

> First, the Commissioner considers whether the claimant
> is currently engaged in substantial gainful activity.
> Where . . . the claimant is not so engaged, the Commis-
> sioner next considers whether the claimant has a "se-
> vere impairment" that significantly limits his physical
> or mental ability to do basic work activities. . . .
> Where the claimant does suffer a severe impairment, the
> third inquiry is whether, based solely on medical
> evidence, he has an impairment listed in Appendix 1 of
> the regulations or equal to an impairment listed there.
> . . . If a claimant has a listed impairment, the Com-
> missioner considers him disabled.  Where a claimant
> does not have a listed impairment, the fourth inquiry
> is whether, despite his severe impairment, the claimant
> has the residual functional capacity to perform his
> past work. . . . Finally, where the claimant is unable
> to perform his past work, the Commissioner then deter-
> mines whether there is other work which the claimant
> could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also
Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart,
388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds on
rehearing, 416 F.3d 101 (2d Cir. 2005); Green-Younger v.
Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater, supra,
221 F.3d at 132; Tejada v. Apfel, supra, 167 F.3d at 774.

        Step four requires that the ALJ make a determination as
to the claimant's RFC.  See Sobolewski v. Apfel, 985 F. Supp.
300, 309 (E.D.N.Y. 1997).  RFC is defined in the applicable
regulations as "the most [the claimant] can still do despite
[his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).
To determine RFC, the ALJ makes a "function by function assess-
ment of the claimant's ability to sit, stand, walk, lift, carry,
push, pull, reach, handle, stoop, or crouch."  Sobolewski v.
Apfel, supra, 985 F. Supp. at 309.  The results of this assess-
ment determine the claimant's ability to perform the exertional
demands of sustained work, and may be categorized as sedentary,[34]
light, medium, heavy or very heavy.  20 C.F.R. §§ 404.967,
416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL
150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

_____

        [34]Sedentary work generally involves up to two hours of
standing or walking and six hours of sitting in an eight-hour
workday.  SSR 96-9p, 1996 WL 374185 at *3 (1996).  Sedentary work
also involves "lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files,
ledgers, and small tools."  20 C.F.R. §§ 416.967(a).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Burgess v. Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra, 335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than the claimant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80; Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl, D.J.).  When a claimant retains the RFC to perform at least one of the categories of work listed on the Grid, and when the claimant's educational background and other characteristics are also captured by the Grid, the ALJ may rely exclusively on the Grid in order to determine whether the claimant retains the RFC to perform some work other than his or her past work.  Butts v. Barnhart, 388 F.3d at 383 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the

86

applicable medical vocational guidelines (the [Grid]).") (internal quotation and citation omitted).

However, "exclusive reliance on the [Grid] is inappropriate" where non-exertional limitations "significantly diminish [a claimant's] ability to work." Butts v. Barnhart, supra, 388 F.3d at 383, quoting Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (internal quotation omitted); Bapp v. Bowen, supra, 802 F.2d at 603.  When a claimant suffers from a non-exertional limitation such that she is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," Butts v. Barnhart, supra, 388 F.3d at 383 (internal quotation and citation omitted), the Commissioner must introduce the testimony of a vocational expert in order to prove "that jobs exist in the economy which the claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383; see 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

When considering the evidence in the record, the ALJ is required to give deference to the opinions of treating physicians.  Under the regulations' "treating physician rule," a

treating physician's opinion will be given controlling weight if
it is "well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in . . . [the] record."  20 C.F.R.
§ 404.1527(d)(2); Shaw v. Chater, supra, 221 F.3d at 134; Diaz v.
Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v.
Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  Before giving a
treating physician's opinion less than controlling weight, the
ALJ must apply various factors to determine the amount of weight
the opinion should be given.  These factors include:  (1) the
length of the treatment relationship and the frequency of exami-
nation; (2) the nature and extent of the treatment relationship;
(3) the medical support for of the treating physician's opinion;
(4) the consistency of the opinion with the record as a whole;
(5) the physician's level of specialization in the area and (6)
other factors that tend to support or contradict the opinion.  20
C.F.R. § 404.1527(d)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d
at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at
*16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.) (adopting Report and
Recommendation of Freeman, M.J.); Matovic v. Chater, 94 Civ. 2296
(LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan 12. 1996) (McKenna,
D.J.).  "[G]ood reasons" must be given for declining to afford a
treating physician's opinion controlling weight.  20 C.F.R.
§ 404.1527(d)(2); Schisler v. Sullivan, supra, 3 F.3d at 568;

88

Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *6 n.3
(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

      B.  Evaluation of ALJ Farrell's
          April 27, 2007 Decision

      ALJ Farrell noted that because plaintiff's earnings
record demonstrated that he was insured through December 31,
1994, he had to establish disability on or before that date in
order to be entitled to DIB (Tr. 634-48).  Neither party disputes
that December 31, 1994 is plaintiff's last insured date.

      ALJ Farrell then applied the five-step analysis de-
scribed above, ultimately finding that plaintiff was not disabled
on or before December 31, 1994 (Tr. 634).

      1.  Step One

      First, ALJ Farrell found that plaintiff had not engaged
in substantial gainful activity between his alleged onset date of
December 31, 2004 and his date last insured of December 31, 2004
(Tr. 636).

      2.  Step Two

      Second, ALJ Farrell found that plaintiff had the severe
impairments of Meniere's syndrome, PTSD and personality disorder
as of December 31, 2004 (Tr. 636).  He supported the finding of a
severe impairment due to Meniere's disease with the medical

records from plaintiff's visit with Dr. Schwartz on August 12, 1995 at which plaintiff reported a week-long episode of dizziness two weeks prior (Tr. 636). He acknowledged, however, that the record contains no evidence that plaintiff sought treatment for dizziness before December 1994 and that plaintiff does not claim he sought treatment for dizziness before August 1995 (Tr. 636). ALJ Farrell also supported his conclusion at this step with reports from plaintiff's visits with Dr. Fontanez starting in January 1996 (Tr. 636). He noted Dr. Fontanez's December 1996 findings of fatigue, night sweats, joint pain, nausea and a string of dizzy spells lasting about a month and that at that time plaintiff was provisionally diagnosed with positional vertigo and prescribed Meclizine for dizziness (Tr. 636). ALJ Farrell noted that Dr. Fontanez first suspected Meniere's disease in March 1997, at which point plaintiff underwent a neurological evaluation and ENG testing (Tr. 636-37). ALJ Farrell relied on the diagnosis of "atypical" Meniere's syndrome due to right-sided inner ear dysfunction based on the test results (Tr. 637). He noted that plaintiff visited the Community Health Plan Clinic four times in April and May 1997 complaining of dizziness, ringing in his ears and an unsteady gait and that at a November 1997 visit with Dr. Fontanez he reported that he had periods of incapacitation lasting one to two days and could not work (Tr. 637). He also attributed some weight to Dr. Fontanez's statement

90

that, although he did not treat plaintiff before January 1996, based on plaintiff's statements "it seem[ed] very clear to [him] that [plaintiff's] symptoms were definitely present and were related to the current diagnosis of Meniere's disease dating back prior to December, 1994" (Tr. 637).  The ALJ also noted that his finding of a severe impairment due to Meniere's disease before plaintiff's date last insured was consistent with the 2001 testimony of medical expert Dr. Nash, medical expert, that plaintiff's history of dizzy spells was attributable to Meniere's disease (Tr. 637).  The ALJ further noted that Dr. Nash's conclusion that plaintiff suffered from a severe impairment due to Meniere's prior to December 1994 was consistent with Dr. Fontanez's physical findings from March 1997, but acknowledged that his opinion had no support in the records from plaintiff's earlier visits with Dr. Fontanez (Tr. 637).

ALJ Farrell also found that plaintiff had the psychiatric impairments of personality disorder and PTSD, despite the fact that his initial application only alleged disability due to Meniere's disease (Tr. 636-38).  This finding was prompted by Dr. Satloff's testimony retrospectively evaluating plaintiff's psychiatric condition and was supported by various evidence in the record (Tr. 637-38).  Significantly, as ALJ Farrell noted, Dr. Gindes diagnosed plaintiff with PTSD and personality disorder not otherwise specified (Tr. 638).  Dr. Gindes' examination noted

91

a history of emotional instability and violence in plaintiff's
youth (Tr. 638) and that at the time in September 2001 he was
taking Prozac as well as Clonazepam for anxiety (Tr. 638).  Dr.
Gindes also observed chronic dysphoric mood, irritability, rage
episodes, a feeling of worthlessness and flashbacks of being
abused as a child, as well as panic attacks characterized by
chest pain, heart palpitations, dizziness and fear of losing
control (Tr. 638).  The ALJ also noted that Dr. Rubin diagnosed
plaintiff with chronic PTSD and panic disorder without agorapho-
bia (Tr. 638).  In addition, plaintiff saw Ms. McLain, a thera-
pist, for panic attacks in March 1997 and was evaluated by Kathy
Gray-Bailey, a certified social worker, for attention and irrita-
bility stemming from financial worries in October 1997 (Tr. 637-
38).  ALJ Farrell noted that Ms. Gray-Bailey found plaintiff to
be depressed, sad and anxious, with concerns about irritability
and impulse control, and that she found he had adjustment disor-
der with mixed emotional features (Tr. 638).  ALJ Farrell also
noted plaintiff's fall 1997 visits with Terri Hershowitz, at
which plaintiff reported nighttime panic attacks accompanied by
heart palpitations, a history of physical abuse by his mother
during his childhood, depression symptoms such as irritability
and suicidal ideation, and difficulty sleeping (Tr. 638).

    Although the ALJ found severe psychiatric impairments
resulting from PTSD and personality disorder, he declined to find

a severe impairment based on any cognitive disorder (Tr. 638).
Dr. Gindes had made a rule-out diagnosis of borderline intellec-
tual functioning, but ALJ Farrell concluded this diagnosis was
not consistent with other medical records or plaintiff's academic
records (Tr. 638).  Specifically, it was not supported by plain-
tiff's performance on I.Q. tests overall (including scores of 98
on verbal, 81 on performance, and 91 on the full-scale test) or
Dr. Satloff's analysis of plaintiff's I.Q. results at the August
10, 2006 hearing (Tr. 638-39).  He noted that Dr. Satloff, when
asked if plaintiff's performance I.Q. score of 81 might actually
indicate functioning at a level as low as 76, opined that "the
full-scale I.Q. of 91 better described [plaintiff's] intellectual
functioning, and that [plaintiff] was functioning in the normal
range of intellectual ability" (Tr. 639).  The ALJ stated that he
found Dr. Satloff's opinion on the meaning of plaintiff's I.Q.
score well supported by the totality of the evidence regarding
I.Q. testing and plaintiff's testimony regarding his past employ-
ment -- notably, his performance of job duties such as building
maintenance, answering tenants' complaints, supervising five
other employees, replacing signs and repairing plumbing -- all of
which would be difficult to perform with a significant cognitive
impairment (Tr. 639).

        Neither party challenges ALJ's Farrell's finding that
plaintiff had severe impairments due to Meniere's disease, PTSD

93

and personality disorder prior to December 1994.  However,
plaintiff challenges the ALJ's failure to find a severe impair-
ment based on a cognitive disorder (Pl.'s Mem. in Support at 26-
27).  Plaintiff claims that ALJ Farrell ignored the Weschler
Intelligence Scale for Children (WISC) I.Q. test results from
1971, when plaintiff was eight years old, which he alleges show
that plaintiff's performance I.Q. was 69 (Pl.'s Mem. in Support
at 26).  Plaintiff asserts that pursuant to SSR 82-54, an ALJ is
required to use the lowest of the three WISC scores; that,
according to Dr. Satloff's testimony, I.Q. remains fairly con-
stant throughout life; and that Section 12.05c of the listing of
impairments contemplates that a claimant can meet the listing
with a combination of an I.Q. score between 60 and 70 and another
physical or mental impairment that imposes significant additional
limitations on work-related functioning (Pl.'s Mem. in Support at
26-27, 33).

      However, the scores on the 1971 report from Lakeland
School District are significantly faded and there is no legible
performance I.Q. score of 69 evident from the report (Tr. 576).
Even if the record did reflect a performance I.Q. score of 69 in
1971, this would not support a finding of severe impairment based
on a cognitive disorder in December 1994 or before.  As defendant
notes, the Commissioner's regulations provide that I.Q. scores
obtained when an individual is between seven and sixteen years

old are considered current for two years where the I.Q. score is
above forty.  20 C.F.R. Part 404, Subpart P, Appendix 1,
§ 112.00(D)(10).  Thus, a score of 69 would only have applied
through 1973 and would have no bearing on plaintiff's cognitive
abilities in December 1994.  Nor does the record contain any
other medical evidence supporting a severe cognitive impairment
in December 1994.  Further, as ALJ Farrell noted, plaintiff's
work history includes the performance of tasks that would likely
require significant cognitive ability (Tr. 639).  The work that
plaintiff was performing in the years prior to 1994 included
repairing heating and air conditioning units, overseeing other
groundskeeping staff, reading blueprints of air duct systems,
completing work orders, and maintaining running logs of mainte-
nance performed (Tr. 105-06).  In addition, results from an I.Q.
test conducted much closer in time to December 1994 than the
Lakeland test showed that plaintiff had a verbal I.Q. of 98, a
performance I.Q. of 81 and a full scale I.Q. of 91, which indi-
cated average intelligence (Tr. 543).  Further, although ALJ
Farrell did not note this evidence specifically, Dr. Gindes
stated in his report that plaintiff denied any symptoms of
significant cognitive dysfunction (Tr. 523).

3.   <u>Step Three</u>

At step three, ALJ Farrell found that plaintiff did not
have an impairment or combination of impairments that met or
medically equaled one of the impairments listed in 20 C.F.R. Part
404, Subpart P, Appendix 1 (Tr. 639).  Meniere's disease is
addressed in Section 2.07 of the appendix, which covers
"[d]isturbance of labyrinthine-vestibular function (including
Meniere's disease), characterized by a history of frequent
attacks of balance disturbance, tinnitus, and progressive loss of
hearing."  20 C.F.R. pt. 404, subpt. P, app. 1, § 2.07.  The
listing is met when the claimant has both (A) "[d]isturbed
function of vestibular labyrinth demonstrated by caloric or other
vestibular tests" and (B) "[h]earing loss established by
audiometry."  20 C.F.R. pt. 404, subpt. P, app. 1, § 2.07.  ALJ
Farrell stated that he had

> given careful consideration to listing 2.07 for Meni-
> ere's disease but [found] that the medical records,
> while documenting disturbed function of the right
> vestibular labyrinth demonstrated by caloric and other
> vestibular testing in March 1997, fail[] to support the
> requirements of both testing results and documented
> frequent attacks of balance disturbance, tinnitus, and
> progressive loss of hearing, prior to the date last
> insured in 1994

(Tr. 639).

ALJ Farrell noted that although plaintiff reported
dizziness occurring before 1994, he did not seek medical treat-
ment for dizziness until 1995 and was not tested for Meniere's

disease until March 1997 (Tr. 639). He found that, although
plaintiff's Meniere's disease was "most likely present in 1994,"
it did not rise to the level required by listing 2.07 at that
time (Tr. 639-40). ALJ Farrell referred to Dr. Nash's testimony
that, although he believed plaintiff's condition satisfied the
listing as of 2001, he could not give a firm opinion on whether
plaintiff's symptoms were disabling in December 1994 or before
(Tr. 640). Dr. Nash noted that the earliest medical documenta-
tion of Meniere's symptoms was from 1995 (Tr. 640). Dr. Nash
stated that although he would, like Dr. Fontanez, retrospectively
characterize these types of reported past symptoms as generally
consistent with Meniere's disease, the particular information
reported by plaintiff was not "consistent with the customary
severity of symptoms he associate[d] with Meniere's disease
flare-ups" (Tr. 640). ALJ Farrell also relied on Dr. Nash's
testimony that the vertigo associated with Maniere's disease
makes one feel as if he is dying and typically prompts him to
consult a physician urgently, even, Dr. Nash speculated, in the
face of an extreme fear of doctors (Tr. 640).

ALJ Farrell also considered whether plaintiff's condi-
tion in December 1994 or before satisfied listing 12.06 for
anxiety disorders or listing 12.08 for personality disorders, and
concluded that it did not (Tr. 640). Specifically, ALJ Farrell
found that, with regard to the paragraph B criteria of the mental

97

impairment listings,[35] plaintiff "had mild limitations in activi-
ties of daily living; moderate limitations in social functioning;
moderate difficulties maintaining concentration, persistence and
pace; and no episodes of deterioration or decompensation of
extended duration" (Tr. 640, 647).  He found, based on a compari-
son of the psychiatric records that were closest in time to the
date last insured (still two years later) to psychiatric records
from subsequent years, that plaintiff's psychiatric impairment
was worsening, affecting his functioning more and more as time
passed (Tr. 640).  The records from plaintiff's visits with Ms.
McLain in 1997 show that they were discussing job retraining to
obtain employment, while the findings in Dr. Gindes' examination
in September 2001, four years later, indicated that plaintiff was
socially isolating himself in embarrassment about his episodes of
rage, and that, at that time, he had marked limitations in his
abilities to understand, remember and carry out detailed instruc-
tions and interact appropriately with supervisors, coworkers and
the public (Tr. 640-41).  ALJ Farrell also noted that Dr. Rubin's
examination on August 29, 2001 indicated marked limitations in
all categories of work functioning (Tr. 641).

　　　　ALJ Farrell also relied on Dr. Satloff's testimony
that, although plaintiff had PTSD and personality disorder before

---

　　　　[35]Section 12.06 on anxiety disorders and Section 12.08 for
personality disorders employ the same paragraph B criteria.  20
C.F.R. pt. 404, subpt. P, app. 1, §§ 12.06, 12.08.

December 1994, his impairments did not meet or equal any of the listings at or before that time (Tr. 641).  He also referred to Dr. Satloff's opinion that plaintiff's PTSD was related to childhood abuse and would progress over time (Tr. 641).

Plaintiff challenges ALJ Farrell's finding on the third step based on Dr. Satloff's alleged failure to explain his reasons for opining that plaintiff did not meet the listings prior to December 1994 and argues that there was no basis in the record for Dr. Satloff's conclusion (Plaintiff's Reply Brief in Support of Cross Motion for Judgment on the Pleadings under Rule 12(c) ("Pl.'s Reply Memo.") at 3).  However, it was the <u>lack</u> of evidence in the record that compelled Dr. Satloff's conclusion that plaintiff's impairments did not meet the listings prior to December 1994 (<u>see</u> Tr. 914-15).  Plaintiff points to nothing in the record that would establish "[d]isturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests" or "[h]earing loss established by audiometry" in or prior to December 1994.  <u>See</u> 20 C.F.R. pt 404, subpt P, app. 1, § 2.07(A)-(B).  Nor does he identify any evidence that would establish that the paragraph B criteria from Sections 12.06 and 12.08 were satisfied prior to December 1994.  Because plaintiff bears the burden of proof at step three, the alleged lack of evidence to support Dr. Satloff's conclusion is of no moment in the absence of evidence to the contrary.

4.  Step Four

        a.  ALJ Farrell's Analysis
            Under Step Four

    At step four, ALJ Farrell found that, as of the date
last insured, plaintiff had the RFC to "perform work at all
exertional levels" but that he "should avoid exposure to work-
place hazards, such has height and dangerous machinery," that
plaintiff was "limited to unskilled or semiskilled work, not
requiring a high level of concentration [and that does not
involve] rapid performance or abrupt changes in work routines or
work requirements" and that plaintiff "should not work in a
setting where there is likely to be an adversarial relationship
with supervisors or coworkers," nor should he "be under close
supervision" (Tr. 641).[36]  ALJ Farrell also reiterated his con-
clusion that, with regard to the paragraph B criteria, in 1994
plaintiff had "mild limitations in activities of daily living;
moderate limitations in social functioning; moderate difficulties

_____

        [36]As defendant points out, ALJ Farrell failed to make any
finding with regard to plaintiff's ability to interact with the
public (Def.'s Reply Mem. at 5 n.2; see Tr. 641).  Presumably,
this simply meant that ALJ Farrell did not find any such
limitation.  However, even if ALJ Farrell unintentionally omitted
a limitation on plaintiff's ability to interact with the public,
it would not affect his ultimate conclusion because, as discussed
below, he found plaintiff could perform his past job as a perfume
packager, which did not involve interaction with the public (Tr.
647; see Tr. 997).

100

maintaining concentration, persistence and pace; and no episodes of deterioration or decompensation of extended duration" (Tr. 647). His determination of plaintiff's RFC as of December 1994 was based on his evaluation of plaintiff's credibility and his assessment of various conflicting opinion testimony (Tr. 641-47).

Because the only diagnoses or medical records available are from well after the expiration of plaintiff's insured status, plaintiff's own statements concerning the severity and nature of his symptoms in December 1994 and prior were particularly significant; thus, ALJ Farrell noted, the strength of plaintiff's credibility was crucial to his determination of disability (Tr. 643). ALJ Farrell also stated that Dr. Fontanez's retrospective opinion that plaintiff was unable to work prior to December 1994 was based exclusively[37] on plaintiff's statements regarding his

_____

[37]In my prior Report and Recommendation addressing the parties' initial motions for judgment on the pleadings in plaintiff's challenge to ALJ Gibbons' decision, I found that Dr. Fontanez's retrospective opinion was based "not only on plaintiff's reported history but also upon his own examinations of the plaintiff" (Report and Recommendation, issued by the undersigned in 99 Civ. 3943, dated August 25, 2000, at 21). Dr. Fontanez's statements in his letter to Mr. White allow for the possibility that his physical examinations of plaintiff played a role in his retrospective opinion, and it is logical that they would have (Tr. 176 ("through my extensive contact with him at multiple office visits I have become convinced that his history of these complaints date back prior to December, 1994")). In addition, Dr. Fontanez based several of his findings in the Medical Assessment of Residual Functional Capacity on physical examinations of plaintiff and test results, and the Assessment also included a statement that the limitations Dr. Fontanez identified had existed since 1994 (Tr. 166-71). However, it is
                                                    (continued...)

past symptoms and, as a result, its value depended on the strength of plaintiff's credibility and the accuracy of his reported history (Tr. 643).

ALJ Farrell found that plaintiff's "medically determinable impairments could have been reasonably expected to produce some of the alleged symptoms, but that [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely credible" (Tr. 643). ALJ Farrell questioned plaintiff's credibility based on several inconsistencies in his and his wife's statements as well as discrepancies between their statements and other information in the record -- which suggested, overall, that plaintiff's condition was less severe, and developed later, than he alleges (Tr. 643-45).

First, ALJ Farrell found that plaintiff's failure to seek medical treatment for an extended period of time while he was allegedly experiencing disabling symptoms cast doubt on the severity of his condition and his alleged inability to work (Tr. 643). He noted that plaintiff claimed to have stopped working in

---

[37] (...continued)
also clear that in the letter Dr. Fontanez relied primarily on plaintiff's reported history (Tr. 176 (basing opinion on "[h]is symptoms according to his history, which is what I have to rely on since I did not take care of the patient prior to January 1996")). Thus, plaintiff's credibility still legitimately affects the weight to be given Dr. Fontanez's retrospective opinion.

1990 or 1991 because of his impairments, but did not seek medical treatment until 1995 -- offering several reasons including his fear of doctors, his work schedule and his boss's lack of flexibility, his wife's belief that his symptoms would go away when he stopped working, and his wife's opinion that it was helpful to have him home taking care of the children (Tr. 643). ALJ Farrell found that plaintiff's allegations as to the severity of his symptoms before 1994 were suspect given his failure to see a doctor earlier than 1995 and Dr. Nash's testimony that Meniere's disease is so devastating that sufferers "universally" seek out medical treatment (Tr. 643). ALJ Farrell also noted that, despite his alleged fear of doctors, plaintiff saw Dr. Fontanez for problems _other_ than dizziness and vertigo before he sought treatment from Dr. Fontanez for his Meniere's disease (Tr. 644).

Second, ALJ Farrell noted inconsistencies in plaintiff's reported activities from his separation from his job at Capelli Development in 1990 or 1991 through August 1995 (Tr. 643-44). Plaintiff testified at multiple earlier hearings that he performed odd jobs during that period of time (Tr. 643-44). At the 2006 hearings before ALJ Farrell, however, plaintiff testified that he did no paid work after 1990 or 1991, and maintained this assertion even when asked specifically about odd jobs (Tr. 644). The ALJ credited the earlier testimony, which indicated a higher level of functioning (Tr. 644).

103

Related to this point, one of the jobs plaintiff described involved redoing a neighbor's roof in spring 1995, a project which ALJ Farrell found "logically . . . would appear to be one of the worst types of work for an individual experiencing for several months, untreated, the symptoms of Meniere's, specifically frequent attacks of dizziness or vertigo as he described them" (Tr. 644).  He noted that "[s]uch a roofing job would require frequent trips up and down a ladder and working all day, not only at considerable height from the ground, but also on a sloped surface" (Tr. 644).

Third, ALJ Farrell noted that plaintiff did not complain about severe dizziness or vertigo to Dr. Fontanez until December 1996, two years after the expiration of his insured status (Tr. 644).  At several of plaintiff's initial visits with Dr. Fontanez in early 1996, he did not even mention dizziness or vertigo (Tr. 644).  ALJ Farrell noted that, "[i]n fact, all of [plaintiff's] contemporaneous reports to treating physicians and medical providers relate the onset of his dizziness to about December 1996, not before" (Tr. 644).  Specifically, plaintiff reported both to Dr. Kucherov and Ms. McLain that his episodes of dizziness began in December 1996 (Tr. 644).

Fourth, ALJ Farrell noted that plaintiff's Meniere's symptoms appeared to respond well to medication which he took at low dosages and which was also available over the counter, and

104

found that this undermined his claims of severe and disabling
symptoms (Tr. 644-45).

ALJ Farrell reasoned, overall, that

the lack of complaints of dizzy spells to medical
providers, the documented history of onset of dizziness
in December 1996, the prior testimony of working and
particularly working on a roof in early 1995, the good
response to low-dose medication in early 1997, and Dr.
Nash's explanation of the symptoms of a typical Meni-
ere's attack, all taken together, lead to the determi-
nation that [plaintiff] had a medical condition consid-
erably less limiting than he alleges prior to his
expiration of insured status.

(Tr. 645).

ALJ Farrell then evaluated the opinion testimony
provided by various doctors (Tr. 645-47).  First, he considered
Dr. Fontanez's opinion that plaintiff had had extertional and
nonexertional limitations that precluded him from working, even
in a sedentary position, since 1994 -- specifically, that plain-
tiff had been limited to lifting no more than ten pounds, had
been limited in standing and walking and had other postural
limitations (Tr. 645).  ALJ Farrell acknowledged that he was
required to give controlling weight to the opinion of Dr.
Fontanez, a treating physician, if it was well supported and not
inconsistent with other evidence in the record (Tr. 645).
However, he found that Dr. Fontanez's opinion was based on
plaintiff's self-reported history and thus its worth depended on
plaintiff's credibility, which ALJ Farrell found to be

105

deficient[38] (Tr. 645).   To the extent Dr. Fontanez's opinion bore

on plaintiff's RFC, ALJ Farrell decided to afford it little

weight because it was not supported by the record overall,

because Dr. Fontanez did not treat plaintiff in 1994 or before

and because it was based entirely on plaintiff's statements in

December of 1997, three years after he was last insured (Tr.

645).

        Rather than crediting Dr. Fontanez's opinion that

plaintiff had both nonexertional and exertional impairments in

1994, ALJ Farrell relied on Dr. Satloff's testimony to conclude

that plaintiff had only nonexertional impairments as of his last

insured date (Tr. 645-46).   Dr. Satloff had testified that

plaintiff would not be able to perform work at heights or using

dangerous machinery because of his Meniere's disease (Tr. 645).

He also testified that due to his PTSD plaintiff should avoid

conflict with people and adversarial work environments and that

he would not be able to perform jobs requiring a high level of

---

        [38]This finding is not inconsistent with ALJ Farrell's
decision to give credence to parts of Dr. Fontanez's
retrospective opinion in step two, where he found that plaintiff
did have a severe impairment due to Meniere's disease before
December 1994.   That plaintiff did experience significant
Meniere's symptoms prior to December 1994, but that they were not
so severe as to leave him with an RFC that would preclude all
work, is consistent with substantial evidence in the record.   The
credibility issues ALJ Farrell raised cast doubt on plaintiff's
alleged inability to work before December 1994, but do not
necessarily rule out a severe impairment due to Meniere's
symptoms during that time period.

concentration, rapid performance of tasks, or abrupt changes in routine (Tr. 646).  ALJ Farrell also emphasized Dr. Satloff's opinion that plaintiff's symptoms as of his date last insured would not preclude him from all work (Tr. 646).  Overall, ALJ Farrell attributed the most weight to Dr. Satloff's opinions because they were "more consistent with the diagnosis, observations and treatment of [plaintiff] closer to the date he was last insured" than the other opinions and because they were based on a comprehensive review of the record (Tr. 647).

ALJ Farrell disregarded Dr. Gindes' finding that plaintiff had marked limitations in several areas of mental functioning, because it was based on a single examination in 2001 and thus had limited relevance to plaintiff's condition in 1994 (Tr. 646).

ALJ Farrell considered Dr. Levine's testimony given in the "deposition" conducted by plaintiff's counsel (Tr. 646), but rejected Dr. Levine's opinion that it was "more reasonable than not" that plaintiff had a marked impairment in his ability to interact appropriately with others in 1991, as it did not appear to correspond to the definition of a "marked" impairment as defined in the Social Security regulations (Tr. 646-47).

b.   Evaluation of ALJ
     Farrell's Finding
     <u>Under Step Four</u>

Plaintiff suggests that ALJ Farrell's assessment of plaintiff's credibility is "infected by an erroneous or incomplete view of the law and evidence" (Pl.'s Mem. in Support at 34, <u>quoting</u> <u>Treadwell v. Schweiker</u>, 698 F.2d 137, 144 (2d Cir. 1983)).  Plaintiff disputes one of the inconsistencies identified by ALJ Farrell, citing <u>De Leon v. Secretary</u>, 734 F.2d 930, 930-34 (2d Cir. 1984) for the proposition that "[a] claimant's . . . refusal to obtain treatment for [a psychiatric disability] is not necessarily probative" (Pl.'s Mem. in Support at 35).  However, ALJ Farrell was relying primarily on plaintiff's failure to seek treatment for Meniere's disease despite allegations of extreme dizziness and vertigo before 1994, not his failure to seek treatment for psychiatric conditions (<u>see</u> Tr. 643).  A claimant's failure to seek treatment during the time period in which he claims to have been disabled may generally be considered in determining disability.  <u>Arnone v. Bowen</u>, <u>supra</u>, 882 F.2d at 39 (While the court was "not persuaded that the dearth of contemporaneous evidence <u>necessarily</u> preclude[d] Arnone's entitlement to a 'period of disability,'" the Secretary, "[i]n rejecting Arnone's proof of a continuous disability as insufficient . . . properly attributed significance to Arnone's failure to seek any medical attention during the crucial 1977-80

period."); <u>Cava v. Barnhart</u>, 03 Civ. 6621 (DC), 2004 WL 1207900
at *10 (S.D.N.Y. June 1, 2004) (Chin D.J.) (rejecting treating
physician's retrospective diagnosis and upholding denial of
benefits where the record contained no indication of plaintiff's
depression during the relevant time period, plaintiff did not
seek treatment during the relevant time period, and plaintiff's
explanation for failing to seek treatment was unpersuasive);
<u>Keller v. Barnhart</u>, 01 Civ. 4334, 2002 WL 31778867 at *3
(S.D.N.Y. Dec. 12, 2002) (Sweet, D.J.) (affirming the ALJ's
conclusion that plaintiff failed to establish the existence of a
disability during the relevant time period where there was no
evidence of treatment during that time period); <u>Moscatiello v.
Apfel</u>, 129 F. Supp. 2d 481, 489 (E.D.N.Y. 2001) ("The Commis-
sioner . . . was entitled to consider plaintiff's failure to seek
treatment for her mental condition before her last-insured date,
or indeed, until 2 1/2 years later.").

     Here, plaintiff and his wife claimed that he experi-
enced dizziness and vertigo so severe he could not work between
1991 and 1994, but plaintiff did not see a doctor until the
middle of 1995, and even after that did not seek continuous
treatment until December of 1997.  Plaintiff alleged a fear of
doctors but was apparently still willing to seek medical treat-
ment for other issues like carpal tunnel syndrome and hand and
foot problems prior to 1995 (Tr. 246, 256, 264).  His other

explanation -- that he was prevented from seeing a doctor by his boss at Capelli Development -- ceased to have any weight as soon as he left that job in 1990 or 1991.  ALJ Farrell did not err in relying on plaintiff's failure to seek treatment in 1994 or before to support his conclusion that plaintiff was not disabled before his insured status expired.

In any case, plaintiff's failure to seek treatment for his Meniere's during the relevant time period was just one of several inconsistencies ALJ Farrell identified as undermining plaintiff's credibility, all of which were supported by substantial evidence.  The record contains clearly contradictory statements by plaintiff regarding whether he performed odd jobs between 1991 and 1995 (Tr. 28-30, 244-45, 968).  In addition, the reports plaintiff made to his medical providers regarding his episodes of dizziness and vertigo suggest that these episodes were limited to one one-and-a-half week period in August 1995 and an indefinite period beginning in December 1996[39] (Tr. 134-35, 139, 144-45; see Tr. 501).  Finally, plaintiff's Meniere's symptoms were being treated effectively with a relatively low dose of medication as of January 1997, when he reported that he was "feeling good and the pills [we]re working great" (Tr. 147).

---

[39]Although he did not note this in his decision, ALJ Farrell's finding that plaintiff did not experience particularly severe dizziness before August 1995 is also supported by Mrs. Kruppenbacher's testimony in 2006 that plaintiff's symptoms had worsened over the years (Tr. 272, 941).

It is "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology." Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995) (Leisure, D.J.); accord Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Richardson v. Astrue, 09 Civ. 1841 (SAS), 2009 WL 4793994 at *6 n.97 (S.D.N.Y. Dec. 14, 2009) (Scheindlin, D.J.); see Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984); Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of wit- nesses, including the claimant."). A credibility determination is a valid reason for rejecting the opinion of a treating physi- cian. See Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999) (upholding district court's affirmance of Commissioner's denial where the treating physician's opinion, favorable to the plain- tiff, was "based heavily on [the plaintiff's] subjective com- plaints and [wa]s at odds with the weight of the objective evidence"); Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989) (ALJ was warranted in rejecting treating physician's opinion that was based on the plaintiff's subjective statements which had already been discredited); Alejandro v. Barnhart, 291 F. Supp. 2d 497,

504 n.4 (S.D. Tex. 2003) ("When a medical opinion is premised on self-reporting and is otherwise unsubstantiated by the record, an ALJ may properly disregard said opinion.").

ALJ Farrell's assessment of the opinion evidence was also legally sound and supported by substantial evidence.  The treating physician rule is applicable to retrospective opinions as well as contemporaneous ones.  Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (finding that the opinion of a physician who did not treat the claimant during the relevant time period "is still entitled to significant weight" and "must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of [an impairment] prior to [the date last insured]") (internal quotations and citations omitted); see Perez v. Chater, supra, 77 F.3d at 48 ("A treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques."); Moscatiello v. Apfel, supra, 129 F. Supp. 2d at 489 ("evidence of plaintiff's condition at a later time was relevant to the extent that it shed light on plaintiff's condition as of the date she was last insured").  But see Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998) ("A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period.").  The Second

112

Circuit has also stated, in the context of a retrospective diagnosis by a treating physician, that "a circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion." Wagner v. Secretary of Health & Human Servs., 906 F.2d 856, 862 (2d Cir. 1990); accord Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003); Rivera v. Sullivan, supra, 923 F.2d at 968, 968 n.5 (noting that "[t]he strength of [the Court's] language in Wagner may have been influenced by the fact that the same doctor was involved throughout the claimant's treatment").

However, for a retrospective opinion to be controlling, it still must be supported by a clinically acceptable diagnostic technique. Rivera v. Sullivan, supra, 923 F.2d at 968 n.4. In addition, it need not be accepted if it is contradicted by substantial evidence in the record. Cava v. Barnhart, supra, 2004 WL 1207900 at *8-*9 (rejecting treating physician's retrospective diagnosis and upholding denial of benefits where the "retrospective opinion was inconsistent with the record" due to lack of medical documentation of an impairment as of the date last insured); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004) (Marrero, D.J.) (a "retrospective diagnosis from a physician, particularly one who was not the claimant's treating physician during the relevant period, may carry less weight if

the diagnosis is inconsistent with other substantial evidence in the record").

In addition, the treating physician rule is to be applied in light of the duration, nature and extent of the treatment relationship.  20 C.F.R. § 404.1527(d)(2); see Schisler v. Sullivan, supra, 3 F.3d at 567.  The fact that Dr. Fontanez's opinion applied to a time period during which he did not even treat plaintiff lessens its weight.  Arnone v. Bowen, supra, 882 F.2d at 40-41 (physician who had not treated claimant during the relevant time period was "not in a unique position to make a complete and accurate diagnosis of [his] condition during [that time period]") (internal quotations and citation omitted).

ALJ Farrell rejected Dr. Fontanez's retrospective opinion because it lacked corroboration by any objective findings from 1994 and was supported only by certain of plaintiff's subjective statements, which were themselves contradicted by other evidence and, thus, not credible.  Even assuming that Dr. Fontanez's opinion was based on "medically accepted clinical diagnostic techniques" by virtue of having been formed in the context of the course of his treatment of plaintiff for Meniere's disease and other conditions, (see Report and Recommendation, issued by the undersigned in 99 Civ. 3943, dated August 25, 2000, at 21), Dr. Fontanez's opinion was contradicted by substantial evidence in the record.  Significantly, plaintiff failed to seek

114

medical treatment until August 1995 (Tr. 28-29, 245-46) and the record contains no documentation of persistent chronic dizziness or vertigo until late 1996 (see Tr. 139, 144-45, 467, 501).  Not only is Dr. Fontanez's opinion "inconsistent with the other substantial evidence in . . . [the] record," see 20 C.F.R. § 404.1527(d)(2); Shaw v. Chater, supra, 221 F.3d at 134; Diaz v. Shalala, supra, 59 F.3d at 313 n.6; Schisler v. Sullivan, supra, 3 F.3d at 567, but the evidence contravening it is "overwhelmingly compelling" and, thus, sufficient "to overcome [Dr. Fontanez's] medical opinion" under Wagner v. Secretary of Health & Human Servs., supra, 906 F.2d at 862.  To require an ALJ to give credence to a treating physician's opinion when it is contradicted by various statements and actions of the plaintiff, and when the opinion is based primarily on the statements of a plaintiff with questionable credibility, would stretch the treating physician rule too far.

It is true, as plaintiff points out, that I concluded in a Report and Recommendation in this case's predecessor, 99 Civ. 3943, that ALJ Gibbons failed to give sufficient weight to Dr. Fontanez's retrospective opinion regarding the severity of plaintiff's impairments prior to 1994 (Report and Recommendation, issued by the undersigned in 99 Civ. 3943, dated August 25, 2000, at 22).  I found there that the ALJ could not reject Dr. Fontanez's retrospective opinion purely on the basis of an

absence of contemporaneous medical evidence from the relevant
time period (Report and Recommendation, issued by the undersigned
in 99 Civ. 3943, dated August 25, 2000, at 20-21).  See Rivera v.
Sullivan, supra, 923 F.2d at 969 (absence of opinion on disabil-
ity from first physician did not contradict second physician's
retrospective diagnosis); Wagner v. Secretary of Health & Human
Servs., supra, 906 F.2d at 861 (treating doctor's opinion is not
to be discarded "on the basis of prior omissions in the record").
Although I found there that plaintiff's reported history did not
contradict Dr. Fontanez's diagnosis (see Report and Recommenda-
tion, issued by the undersigned in 99 Civ. 3943, dated August 25,
2000, at 20-21)), ALJ Gibbons' decision was based on a much more
limited record.  The current record contains testimony from five
additional hearings, new statements from Mrs. Kruppenbacher and
additional medical evidence.  In addition, while ALJ Gibbons
provided minimal explanation for his rejection of Dr. Fontanez's
retrospective opinion in his decision (see Tr. 11-15), ALJ
Farrell's rejection of Dr. Fontanez's retrospective opinion was
fully explained, well documented and well reasoned, and consid-
ered the factors outlined in 20 C.F.R. § 404.1527(d).  See 20
C.F.R. § 404.1527(d)(2) (requiring that the Commissioner give
"good reasons" for declining to afford a treating physician's
opinion controlling weight); Halloran v. Barnhart, supra, 362
F.3d at 32 (remand was inappropriate where "ALJ applied the

116

substance of the treating physician rule" by identifying incon-
sistencies between the treating physician's opinion and the
record as a whole and other factors that contradicted the treat-
ing physician's opinion).

Plaintiff also objects to the respective weights that
ALJ Farrell afforded the opinions in the record.  Plaintiff
objects to ALJ Farrell's acceptance of Dr. Satloff's testimony
because the ALJ asked him one improper question in the hearing,
i.e., when he believed plaintiff became disabled (Pl.'s Reply
Mem. at 3).  However, it does not appear that ALJ Farrell relied
on Dr. Satloff's answer in his decision.  Overall, it was appro-
priate to credit most of Dr. Satloff's testimony because it was
more consistent with other evidence in the record than were the
opinions of the other physicians.  Various parts of the record
indicated, consistent with Dr. Satloff's opinion, that plaintiff
was able to work for a long period of time despite anxiety
stemming from childhood events (Tr. 104-16, 242, 264-65), that
plaintiff started experiencing significant panic attacks only in
1996 (Tr. 148), that his anxiety was well controlled in early
1997 and did not escalate until October 1997 (see Tr. 136, 835)
and that any symptoms of Meniere's plaintiff experienced before
1994 were not chronic or severe enough to prevent all work.  ALJ
Farrell's rejection of Dr. Satloff's recommendation that plain-
tiff be limited to sedentary work was also legitimate, as Dr.

117

Satloff appeared to be suggesting only that plaintiff avoid working at heights (Tr. 928). Plaintiff claims that ALJ Farrell should have used Dr. Satloff's testimony to support a conclusion that plaintiff had a mental condition that prevented him from working prior to 1994 (Pl.'s Mem. in Support at 27-28, Pl.'s Reply Mem. at 3-5). However, while Dr. Satloff found that plaintiff's mental condition -- caused by PTSD, personality disorder, and the conditions at his job at Capelli Development -- would interfere somewhat with his ability to concentrate, he declined to find that it would preclude him from working, and described conditions under which plaintiff would in fact be able to work (Tr. 926-27, 954-56).

Neither party objects to ALJ Farrell's assessment of Dr. Gindes' opinion, although plaintiff objects to ALJ Farrell's rejection of the portions of Dr. Levine's opinion that were based on Dr. Gindes' assessment (Pl.'s Mem. in Support at 32). Specif-ically, he objects to ALJ Farrell's rejection of the findings that plaintiff had "marked" impairments in various areas of work-related functioning (Pl.'s Mem. in Support at 32). However, ALJ Farrell reasonably rejected these findings because plaintiff's counsel did not use the regulations' definition of term "marked" when he posed the question to Dr. Levine (see 838-44). See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C ("Where we use 'marked' as a standard for measuring the degree of limitation, it

means more than moderate but less than extreme.  A marked limita-
tion may arise when several activities or functions are impaired,
or even when only one is impaired, as long as the degree of
limitation is such as to interfere seriously with your ability to
function independently, appropriately, effectively, and on a
sustained basis.").  Additionally, Dr. Levine only conceded that
"it was more reasonable than not" that plaintiff had such impair-
ments only after prodding from plaintiff's counsel (Tr. 843).

    The ALJ was entitled to weigh the conflicting opinion
evidence, Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998), and
his decision to credit most of Dr. Satloff's testimony was
appropriate as this testimony was consistent with the record as a
whole.

    Plaintiff also claims that in assessing his RFC, the
ALJ failed to follow the requirement that he "consider limita-
tions and restrictions imposed by all of an individual's impair-
ments, even those that are not 'severe.'" (Pl.'s Mem. in Support
at 25-26, 25 n.22, quoting SSR 96-8p, 1996 WL 374184 at *5).
Specifically, plaintiff claims ALJ Farrell failed to consider a
cognitive disorder, plaintiff's alleged attentional difficulties,
his limited ability to deal with people and pressure in the
workplace given his PTSD, his alleged borderline personality
disorder, his alleged inability to stoop and his level of manual
dexterity (Pl.'s Mem. in Support at 26-29).  However, ALJ

119

Farrell's discussion of RFC clearly considered plaintiff's attentional difficulties and his ability to deal with people and pressure in the workplace -- even by the terms of his specific RFC finding (Tr. 641, 646-47). ALJ Farrell had already rejected the possibility of a cognitive disorder earlier in the opinion (Tr. 638-39). With regard to plaintiff's personality disorder, ALJ Farrell's determination of plaintiff's RFC took into account plaintiff's inability to get along with others that Dr. Satloff stated would manifest itself in the workplace as the result of such a personality disorder (Tr. 922, 641 (finding that plaintiff "should not work in a setting where there is likely to be an adversarial relationship with supervisors or coworkers and should not be under close supervision")). With regard to stooping, ALJ Farrell noted that Dr. Fontanez had opined that plaintiff had exertional limitations including "a variety of postural limita-tions," but rejected this aspect of his opinion based on the considerations discussed above (Tr. 645). It is clear that ALJ Farrell considered all of these potential impairments in his RFC determination. With regard to manual dexterity, plaintiff made no allegation of an impairment due to plaintiff's carpal tunnel issues or any other problem with his hands until he mentioned it in his current moving papers, and the references to carpal tunnel in the record were sparse. ALJ Farrell stated that he reached a

determination that the claimant's impairments were nonexertional based on the entire record (Tr. 645).

Plaintiff also claims that ALJ Farrell failed to do a function by function analysis of plaintiff's abilities and that this somehow caused him to arrive at the wrong RFC (Pl.'s Mem. in Support at 33-34).  However, plaintiff's arguments in support of this assertion are simply a reiteration of his arguments that ALJ Farrell should have credited the opinions of Drs. Gindes and Levine that plaintiff was markedly impaired in various types of work-related social functioning (Pl.'s Mem. in Support at 33-34).

5.  <u>Step Five</u>

At the fifth step, ALJ Farrell found that someone with plaintiff's RFC would be able to perform plaintiff's past rele-vant work as a hand packager and, therefore, plaintiff did not have a disability as defined by the regulations in December 1994 (Tr. 647-48).  He noted that plaintiff had worked doing "stock" in a perfume factory for six months in 1984 and found that this was past relevant work because it was performed within fifteen years of his last insured date, <u>see</u> 20 C.F.R. 404.1565, and the earnings were sufficient to make it substantial gainful activity, <u>see</u> 20 C.F.R. 416.960.  ALJ Farrell referred to plaintiff's testimony about the duties of this position, in which plaintiff stated he packed boxes of perfume, standing for 20 to 30 minutes

121

at a time while he took products off the shelves and packed them
in a box, and then sat down while he filled out paperwork (Tr.
647).  The job required him to lift and carry around five pounds
(Tr. 647).  The ALJ relied on the testimony of Dr. Manzi, a
vocational expert, to support his finding that plaintiff's RFC in
December 1994 would have allowed him to perform this work (Tr.
647).  Dr. Manzi classified this job as "hand packager," which is
unskilled work generally performed at the medium level, but was
light work as it was performed by plaintiff in 1984 (Tr. 647-48).
Dr. Manzi testified that someone of plaintiff's RFC as of his
last insured date could perform this job as plaintiff performed
it (Tr. 648).  He testified that there were no performance
requirements or deadlines associated with this position in the
DOT description (Tr. 648).  ALJ Farrell noted that Dr. Manzi's
testimony was consistent with the information in the DOT (Tr.
648).

Plaintiff argues that ALJ Farrell's finding that
plaintiff could perform his past relevant work as a perfume stock
clerk was erroneous because ALJ Farrell asked the vocational
expert a question that did not reflect all of plaintiff's impair-
ments.  Dr. Manzi was asked whether someone of plaintiff's age,
educational level and past work experience would be able to
perform plaintiff's past work as a hand packager if he had no
exertional limitations but should avoid exposure to workplace

122

hazards like heights and dangerous machinery, and were limited to unskilled or semi-skilled work that does not require high levels of concentration, rapid performance or abrupt changes in work routines, and could not work in a setting with close supervision (Tr. 1001-03).  He testified that such a person would be able to perform hand packager work (Tr. 1003).  He testified further that such an individual would still be able to perform the hand packager position at the light level at which plaintiff performed it even if he had the additional limitations of being able to lift, carry, push or pull 20 pounds only occasionally, the ability to lift, carry, push or pull ten pounds frequently, the ability to stand or walk six hours of the workday with normal breaks and the ability to sit six hours in a workday with normal breaks (Tr. 1003).  These questions and answers are entirely consistent with ALJ Farrell's determined RFC and his finding that plaintiff would have been able to perform his past relevant work as a hand packager.  Most of the limitations that plaintiff suggests ALJ Farrell should have included in his question to Dr. Manzi -- limitations in his ability to maintain attention to task, ability to stoop, and ability to use his hands -- are limitations that ALJ Farrell did not include in his RFC.

Plaintiff also argues that there was a conflict between Dr. Manzi's testimony and the DOT because Dr. Manzi testified that plaintiff performed the occupation of hand packager at a

light level and the DOT treats it as medium (Pl.'s Mem. in Support at 37).  This conflict is immaterial.  To support a finding of disability, a claimant must show that he is unable to perform his past relevant work both as it is generally performed and as he actually performed it.  Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003); SSR 82-62, 1982 WL 31386 at *3.

    Plaintiff argues further, relying on SSR 85-15, that he would not be able to perform his past work as a hand packager because he cannot work under close supervision.  However, SSR 85-15 states that "an individual who cannot tolerate being super-vised may not be able to work even in the absence of close supervision."  SSR 85-15, 1985 WL 56857 at *6.  ALJ Farrell found plaintiff should not be under close supervision, not that he should not be under any supervision at all (Tr. 641).  Thus, SSR 85-15 does not apply here.

    Plaintiff also suggests that his position as a hand packager for a perfume company should not be considered past relevant work because the record does not establish that it paid enough to be a substantial gainful activity (Pl.'s Mem. in Support at 2, 36; Pl.'s Reply Mem. at 8-9).  To qualify as past relevant work, a job must have been performed at the substantial gainful activity level.  20 C.F.R. § 404.1560(b)(1); SSR 82-52, 1982 WL 31386 at *1.  Work performed between 1980 and 1989 generally qualifies as substantial gainful activity if the

124

earnings average over $300.00 per month.  20 C.F.R.
§ 404.1574(b)(2) tbl.1.

   The record contains conflicting evidence regarding the
year in which plaintiff worked for the perfume factory and how
many months he worked there (<u>see</u> Tr. 29, 104, 996).  He stated at
one point that the work was performed in 1985, a year in which he
earned only $3,527.25 total and in which he also performed other,
allegedly more highly paid, work (<u>see</u> Tr. 29, 67, 73; Pl.'s Mem.
in Support at 36), but stated at another point that he worked at
the perfume factory full-time for six months in 1994 (a year in
which he earned a total of $15,729.13) (Tr. 67, 73, 996).  In any
case, he reported that he earned $6.50 per hour and worked forty
hours a week as a perfume packer (Tr. 104).  Regardless of how
many months he stayed at this position or whether it was in 1984
or 1985, working forty hours a week for $6.50 per hour would
yield at least $1040.00 per month ($6.50/hr x 40 hours/week x 4
weeks) -- more than three times the $300.00 required by 20 C.F.R.
§ 404.1574(b)(2) tbl.1.

IV.  <u>Conclusion</u>

   Accordingly, for all the foregoing reasons, I respect-
fully recommend that defendant's motion for judgment on the
pleadings be granted, that plaintiff's motion for judgment on the
pleadings be denied and that the complaint be dismissed.

125

V.  Objections

        Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley, III, United States District Judge, 500 Pearl Street, Room 2210, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Pauley.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.

1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
         April 16, 2010

                                    Respectfully submitted,

                                    HENRY PITMAN
                                    United States Magistrate Judge

Copies mailed to:

Irwin M. Portnoy, Esq.
542 Union Avenue
New Windsor, New York 12553

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
3rd Floor
86 Chambers Street
New York, New York 10007