USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/14/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
KEVIN KRUPPENBACHER,                      :

                  Plaintiff,   :   04 Civ. 4150 (WHP)

    -against-                           :   MEMORANDUM & ORDER

MICHAEL J. ASTRUE, Commissioner           :
of Social Security,
                                          :
                  Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Kevin Kruppenbacher ("Kruppenbacher") brings this action under the Social Security Act ("SSA"), 42 U.S.C. § 405(g), seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. On April 16, 2010, Magistrate Judge Henry B. Pitman issued a 127-page report (the "Report") recommending that this Court grant the Commissioner's motion for judgment on the pleadings. After review of the record and Kruppenbacher's objections, this Court adopts Judge Pitman's well-reasoned report in full.

## BACKGROUND

        The facts of this case are thoroughly set forth in the Report. (See Kruppenbacher v. Astrue ("Kruppenbacher II"), 04 Civ. 4150 (WHP) (HBP), ECF No. 28.) This Court summarizes only those facts related to Plaintiff's objections.

1

I. Procedural History

On April 17, 1997, Kruppenbacher filed an application for disability insurance on the basis of Meniere's disease, alleging December 31, 1994 as his date of last insurance. (Administrative Record ("R.") at 11-12.) Since then, Kruppenbacher has asserted additional disabilities due to depression, anxiety disorder, personality disorder, post-traumatic stress disorder ("PTSD"), and cognitive disorder. (R. at 124, 126, 240, 954, 960.) On September 10, 1997, the Social Security Administration ("SSA") determined that he was not disabled. (R. at 48.) Following that initial determination, Kruppenbacher filed two civil actions, and this Court has twice remanded to the Commissioner for further proceedings. On April 27, 2007, ALJ Terence Farrell denied Kruppenbacher's claim for disability insurance. (R. at 630-48.) Kruppenbacher amended his Complaint on November 26, 2007, and this case was referred to Magistrate Judge Henry B. Pitman. On March 24, 2008, the parties cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

II. Factual Background

   A. Impairments

      1. Meniere's Disease

Meniere's disease is a condition that causes attacks of vertigo, dizziness, and hearing loss. (Report at 11.) Although Kruppenbacher first began experiencing episodes of dizziness in 1980, he did not see a doctor for these symptoms until 1995. (Report at 12.) Kruppenbacher attributes this delay to financial concerns and a fear of doctors. (Report at 15, 59.)

Kruppenbacher first visited Dr. Jose Fontanez ("Fontanez"), his primary treating physician, in January 1996 for high blood pressure. (Report at 16.) While Kruppenbacher reported frequent headaches, dizziness, and nausea, the visit was essentially a "smoking cessation consultation." (Report at 17.) At his next visit in April 1996, Kruppenbacher did not report any dizziness. (Report at 17.) He first reported experiencing vertigo on a visit to Fontanez in December 1996. (Report at 17.) Fontanez began to suspect Meniere's disease in April 1997. (Report at 18.)

In March 1997, Fontanez sent a letter to Kruppenbacher's attorney detailing Kruppenbacher's condition:

> Although I have known the patient only since January of 1996, through my extensive contact with him at multiple office visits I have become convinced that his history of these complaints date back prior to December 1994, and have in fact been present for possibly longer than four years. This is my opinion based on my extensive dealings and multiple office visits with Mr. Kevin Kruppenbacher.

(Report at 26.) Between 1995 and 2006, Kruppenbacher saw several other doctors, who also indicated symptoms of Meniere's disease. (See Report 26-55.) In 1997, he underwent an electronystagmogram and an audiogram. (Report at 53-54.) The results were consistent with Meniere's disease. (Report at 53-54.)

### 2. Cognitive Functioning, PTSD, and Personality Disorder

In 1971, Kruppenbacher scored a verbal IQ of 92 on an intelligence test. (R. at 576.) The test results contain two additional illegible scores, one of which Kruppenbacher contends shows a performance IQ of 69. (Report at 94.)

In August 2001, psychologist Dr. Jeffrey Rubin ("Rubin") found that Kruppenbacher had a verbal IQ of 98, a performance IQ of 81, and a full scale IQ of 91,

3

indicating that his overall cognitive functioning was "average." (Report at 44.) Rubin also performed a mental residual functional capacity ("RFC"), indicating that Kruppenbacher had difficulty thinking or concentrating, poor memory, and short attention span. (Report at 45.) Rubin found that Kruppenbacher was markedly limited in all areas of understanding and memory, concentration and persistence, social interaction, and adaptation. (Report at 46.) Rubin diagnosed him with depression, PTSD, and panic disorder. (Report at 44.)

In September 2001, psychologist Dr. Alex Gindes ("Gindes") noted Kruppenbacher's depressive symptoms and serious impairment in attention and concentration due to anxiety. (Report at 47-48.) Kruppenbacher's memory skills were mildly impaired. (Report at 48.) Overall, Gindes estimated Kruppenbacher's intellectual function as below-average to borderline. (Report at 49.) Although he found that Kruppenbacher was likely to have difficulty learning new tasks, Gindes stated that he was able to follow and understand simple instructions and was capable of performing simple rote tasks under supervision. (Report at 49.) In addition, Gindes found that Kruppenbacher was markedly restricted in his ability to interact appropriately with supervisors and coworkers. (Report at 51.) Gindes diagnosed PTSD, personality disorder with avoiding features, and ruled out borderline intellectual functioning. (Report at 50.)

Plaintiff began seeing psychologist Dr. Stephen Levine ("Levine") in July 2004. (Report at 35.) Levine diagnosed Kruppenbacher with, among other things, major depressive disorder and control disorder. The record also contains a transcript of an interview of Levine conducted by Kruppenbacher's attorney, during which Levine stated that it was "more reasonable than not" that Kruppenbacher suffered from a "marked" impairment in his ability to interact with others in 1991. (R. at 843.)

4

B. <u>Work History</u>

Kruppenbacher's last formal employment was as a building manager between 1988 and 1991. (Report at 7-8.) After 1991, he performed a variety of odd jobs involving yard work and home repair, including a week-long job as a roofer. (Report at 10.)

C. <u>Medical Experts</u>

1. <u>Dr. Nash</u>

In July 2001, medical expert Dr. Christopher Nash ("Nash") stated that while it was possible that Kruppenbacher had Meniere's disease prior to December 1994, there were no objective findings to support this and he could not make this determination with medical certainty. (Report at 64-65.) According to Nash, Kruppenbacher first qualified as disabled in 1995. (Record at 65.) Nash stated that patients with Meniere's disease can generally cope with proper medication. (Report at 65). He further stated that it would be very unlikely for a patient experiencing disabling Meniere's disease symptoms to avoid seeing a doctor for treatment because the "vertigo feels like you're dying." (Report at 65-66.)

2. <u>Dr. Satloff</u>

In April 2006, medical expert Dr. Aaron Satloff ("Satloff") testified that Kruppenbacher suffered from both Meniere's disease and PTSD. (Report at 66.) However, he further testified that as of 1994, none of Kruppenbacher's impairments, either individually or in combination, qualified as a listed impairment. (Report at 67.) According to Satloff, Kruppenbacher was capable of performing sedentary work in a "more nurturing, less conflict laden environment" as opposed to a workplace in which there was an adversarial relationship between supervisors and employees. (Report at 69, 72-73.) At a supplemental hearing in August 2006, Satloff testified that Kruppenbacher—to a reasonable degree of medical certainty—

suffered from PTSD in December 1994. (Report at 72.) This would have manifested itself in difficulty concentrating, remembering instructions, and carrying out repetitive or repetitious tasks. (Report at 72.) However, in Satloff's opinion, this would not have prevented Kruppenbacher from working; instead, he would be precluded only from positions that required high concentration, rapid performance, or abrupt changes in routine. (Report at 72.) In addition to PTSD, Satloff testified that Kruppenbacher suffered from a personality disorder with avoidance features. (Report at 73.) Regarding Kruppenbacher's cognitive abilities, Satloff testified that he believed Kruppenbacher's "true" IQ to be a 91, as opposed to his lower score of 81. (Report at 73.)

The ALJ asked both Nash and Satloff whether Kruppenbacher's limitations would have prevented him from working in 1994, and both responded in the negative. (R. at 288, 954.)

## DISCUSSION

I. <u>Applicable Law</u>

In order to be "disabled" within the meaning of the SSA, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 45 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 45 U.S.C. § 423(d)(2)(A).

The Commissioner is required to make a five-step inquiry pursuant to 20 C.F.R. §§ 404.1520 and 416.920: (1) whether the claimant is engaged in any substantial gainful activity;

6

(2) if so, whether the claimant has a "severe impairment" which significantly limits his ability to work; (3) if so, whether the impairment is one of the "listed" conditions for which the Commission presumes disability; (4) if not, whether the claimant is able to perform his past work despite the disability; and (5), if not, whether the claimant can perform any other work. Curry v. Apfel, 209 F.3d 117, 122 (2d. Cir. 2000). The burden of proving the first four steps is on the claimant, while the burden of proving the fifth is on the Commissioner. Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002). To obtain disability insurance benefits, a claimant's disability must have commenced prior to the expiration of his or her last date of insurance. 20 C.F.R. §§ 404.130, 404.315; 42 U.S.C. § 423(c).

II. The ALJ's Decision

At Step One, the ALJ found that Kruppenbacher had not engaged in any substantial gainful employment since December 31, 1994. (Report at 89.)

At Step Two, he found that as of that date, Kruppenbacher suffered from severe impairments of Meniere's disease, PTSD, and personality disorder. (Report at 89.) However, he declined to find a severe impairment based on any cognitive disorder. (Report at 93.) Instead, the ALJ was persuaded by Kruppenbacher's "average" IQ of 91 and Satloff's testimony that this score accurately reflected his cognitive abilities. (Report at 93.)

At Step Three, the ALJ found that Kruppenbacher's impairments did not meet or equal a listed impairment in 1994. (Report at 96.) Here, although Kruppenbacher's records documented Meniere's disease in 1997, no such records existed in 1994. (Report at 96.) Moreover, the ALJ noted that Kruppenbacher did not seek treatment for dizziness until 1995, and that the disease was not diagnosed until 1997. (Reports at 96.) The ALJ also referred to the

testimony of Nash, who was unable to give an opinion as to whether Kruppenbacher's condition was disabling in 1994. (Report at 97.) The ALJ gave special weight to Nash's testimony that Meniere's disease is typically so debilitating that it requires immediate medical attention. (Report at 97.) Finally, the ALJ determined that Kruppenbacher did not satisfy the criteria for anxiety or personality disorder. (Report at 98.)

> At Step Four, the ALJ assessed Kruppenbacher's RFC as follows:
>
> No exertional limitations, but should avoid exposure to workplace hazards such as heights and dangerous machinery. . . . [L]imited to unskilled to semi-skilled work that does not require high levels of concentration . . . , rapid performance, or abrupt changes in work routines or work requirements. [S]hould not work in a setting where there's likely to be an adversarial relationship with supervisors or coworkers.

(Report at 100.) Because no medical records exist prior to 1995, the ALJ relied on Kruppenbacher's testimony alone in determining the severity of his symptoms in 1994. The did not credit Kruppenbacher's testimony fully. (Report at 101-05.) The ALJ found that Kruppenbacher's failure to seek treatment prior to 1995 cast doubt on the severity of his symptoms in 1994, particularly in light of Nash's testimony about the severity of typical Meniere's symptoms. (Report at 102-03.) Moreover, the ALJ noted that Kruppenbacher's part-time work as a roofer contradicted a finding of debilitating dizziness and vertigo. (Report at 104.) The ALJ declined to give controlling weight to Fontanez because his opinion was based solely on Kruppenbacher's self-reported history, which was contradicted by other evidence in the record. (Report at 105.)

Finally, at Step Five, the ALJ found that someone with Kruppenbacher's disabilities would be able to perform a job as a hand packager, and therefore did not qualify for disability insurance benefits.

III. Standard of Review

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations" of a magistrate judge. 28 U.S.C. § 636(b)(1). This Court reviews de novo those parts of the Report to which objections are made, and reviews the remainder for clear error on the face of the record. 28 U.S.C. § 636(b)(1); Guzman v. Comm'n of Soc. Sec., No. 05 Civ. 6086 (WHP), 2008 WL 1318920, at *2 (S.D.N.Y. Apr. 9, 2008). "In addition, when a party makes only generalized or conclusory objections, or simply reiterates his original arguments, only the clear error standard is relevant." Strujan v. Teachers Coll. Columbia Univ., No. 08 Civ. 9589 (WHP), 2010 WL 3466251, at *2 (S.D.N.Y. Sept. 3, 2010) (internal quotations omitted). Legal arguments may not be raised for the first time in an objection. Rosello v. Barnhart, 02 Civ. 4629 (RMB), 2004 WL 2366177, at *3 (S.D.N.Y. Oct. 20, 2004) (citing Abu-Nassar v. Elders Futures, Inc., 88 Civ. 7906 (PKL), 1994 WL 445638, at *5 n.2 (S.D.N.Y. Aug. 17, 1994) ("If the Court were to consider . . . these untimely contentions, it would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments.")).

The Social Security Act provides that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see also Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). "Substantial evidence" in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The reviewing court does not conduct a de novo review as to whether the claimant is disabled, Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980), nor may it substitute its own judgment for that of the Commissioner, Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the Commissioner's

decision must be affirmed if it is supported by substantial evidence even if there is also substantial evidence supporting the plaintiff's position. See Jones, 949 F.2d at 59.

IV. Kruppenbacher's Objections

Kruppenbacher submits six[1] objections: the ALJ (1) failed to develop a complete factual record, (2) failed to find that Kruppenbacher suffered from a "severe" cognitive disorder and to consider the combined effects of Kruppenbacher's impairments, (3) erred in evaluating the weight of medical expert testimony, (4) improperly assessed Kruppenbacher's credibility, (5) improperly assessed Kruppenbacher's RFC, and (6) improperly questioned the vocational expert.

A. Failure to Develop a Complete Factual Record

A court may "remand for the taking of additional evidence, on good cause shown, where relevant, probative, and available evidence was either not before the Secretary or was not explicitly weighed and considered by him, although such consideration was necessary to a just determination of a claimant's application." Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975) (remanding for the taking of additional evidence where, inter alia, "many of the medical records . . . [were] illegible"); see also Pratts v. Chater, 94 F.3d 34, 37-38 (2d Cir. 1996) (ALJ's decision not based on substantial evidence where portions of the testimony of the only medical expert were not transcribed).

Kruppenbacher argues that the ALJ erred in failing to consider his 1971 IQ and seeks remand to the Commissioner to create a legible record. However, the illegible IQ is neither relevant nor probative. An ALJ must "develop [a] complete medical history for at least

---

[1] Although Plaintiff purports to object to "the entire report," this Court will confine its discussion to those objections raised in his point headings. This Court observes that Plaintiff's briefs in support of his objections lack clarity. As a consequence, considerable time was expended interpreting his arguments, and they have been construed liberally.

the 12 months preceding the month in which [a claimant] file[s] [an] application unless there is a reason to believe that development of an earlier period is necessary." 20 C.F.R. § 404.1512. The illegible IQ, administered over 20 years prior to Kruppenbacher's date of last insurance, is well outside this 12-month period. Moreover, "IQ tests must . . . be sufficiently current for accurate assessment" in determining cognitive impairment. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10). IQ tests obtained when the claimant is between the ages of 7 and 16 are considered "current" for only two years when the IQ obtained is greater than 40. Thus, the illegible IQ—which Kruppenbacher admits was over 40 and obtained when he was 9—is far from current. Finally, although Kruppenbacher asserts that IQ remains relatively constant throughout life, the Social Security regulations provide only that "IQ tests tend to stabilize <u>by the age of 16</u>." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10). Because he was under the age of 16 at the time the illegible IQ was administered, it is not probative of his current cognitive capabilities. Accordingly, even if the IQ score had been 69, it would not be relevant to these proceedings.[2]

> B. <u>Failure to Find a Severe Cognitive Impairment and Combine the Effects of Kruppenbacher's Impairments</u>

A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). In assessing the severity of a claimant's disability at Step Two, an ALJ must consider the combined effects of all <u>impairments</u>, regardless of whether those impairments are "severe." <u>Dixon v. Shalala</u>, 54 F.3d 1019, 1031 (2d Cir. 1995) (emphasis added).

Kruppenbacher argues that the ALJ erred in failing to find that he suffered a severe cognitive impairment on account of his 1971 IQ score. However, as discussed above, that

---

[2] For the same reasons, it was not error for the ALJ to exclude this test in Steps Three and Four.

11

score was properly disregarded.  Kruppenbacher demonstrated IQs of between 81 and 92, and Satloff testified that an IQ of 91—within the normal range of intellectual ability—better described Plaintiff's intellect.  As the ALJ noted, a severe cognitive impairment would be inconsistent with Plaintiff's previous work activity, especially as a building manager, which required a relatively high level of cognitive functioning.  The ALJ's determination that Kruppenbacher did not suffer from a severe cognitive impairment is therefore supported by substantial evidence.

Next, Kruppenbacher argues that the ALJ failed to consider the combined effects of his PTSD, impaired cognitive functioning, and avoidant personality disorder ("APD") in determining whether Plaintiff's cognitive and psychiatric impairments were severe.  However, the ALJ <u>did</u> find that Kruppenbacher's PTSD and APD constituted severe impairments.  Moreover, as discussed above, Kruppenbacher's cognitive functioning was not an "impairment." Accordingly, the ALJ properly did not consider whether, combined with other ailments, it constituted a "severe" impairment.

Finally, Kruppenbacher argues that by asking Nash and Satloff whether Plaintiff's impairments would prevent him from working, the ALJ inappropriately permitted the experts to determine the ultimate issue in the case.  SSR 96-5p states:

> Medical sources often offer opinions about whether an individual . . . is "disabled" or "unable to work". . . .  Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded.  However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

12

SSR 96-5p, 1996 WL 374183, at *5. Here, there is no indication that the ALJ relied on the experts' responses to these particular questions, let alone that he gave them controlling weight. Accordingly, this objection does not warrant reversal.

      C. <u>Failure to Appropriately Evaluate the Weight of Medical Evidence</u>

      A treating physician's medical opinion is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2); <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004).

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

<u>Halloran</u>, 362 F.3d at 32.

      Kruppenbacher argues that the ALJ should have afforded controlling weight to Fontanez, who stated that Plaintiff suffered from Meniere's disease in 1994. (R. at 176.) First, the ALJ <u>did</u> find that "significant evidence suggests that Plaintiff's Meniere's syndrome . . . [was] most likely present in 1994." (R. at 639-40.) In this assessment, the ALJ and Fontanez are in agreement. Plaintiff disagrees with the ALJ's assessment only to the extent that the ALJ found that this disease "was not at a level meeting the listed requirement" in 1994. (R. at 640.) On this point, Fontanez is silent.

      Moreover, even construing Fontanez's opinion as a finding that Kruppenbacher's Meniere's syndrome met a listed impairment, it is contradicted by substantial evidence in the

13

record. The ALJ noted that Kruppenbacher did not seek medical treatment for dizziness until 1995 and did not undergo testing for Meniere's disease until 1997. The ALJ also noted the medical opinion of Nash, who concurred with the diagnosis of Meniere's disease, but observed that Plaintiff's symptoms prior to December 1994 were not consistent with the disease's customary severity. Finally, Fontanez did not treat Kruppenbacher until 1996. His opinion that Kruppenbacher suffered from Meniere's disease was based solely on what his patient told him. And the ALJ found Kruppenbacher to be not entirely credible. Accordingly, the ALJ was free to determine that Fontanez's opinion was not entitled to controlling weight.

    Kruppenbacher also argues that the ALJ's failure to give Fontanez's testimony controlling—or at least significant—weight is an unjustified departure from the law of the case. On remand to the SSA, however, and in the intervening years, the administrative record grew substantially with additional hearings and medical evidence. Accordingly, the law of the case doctrine does not apply. See Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (noting that the availability of new evidence is a "cogent and compelling" reason to depart from the law of the case).

    Finally, Kruppenbacher argues that the ALJ should have accorded significant weight to the opinion of Levine, the treating psychologist, who opined that it was "more reasonable than not" that Kruppenbacher suffered from a "marked" impairment in his ability to interact with others in 1991. The ALJ correctly noted, however, that this opinion was at odds with the opinion of other medical experts, including Satloff. Faced with this contradiction, the ALJ appropriately gave greater weight to Satloff's opinion because it was "more consistent with the diagnosis, observations and treatment of the claimant closer to the date he was last insured." In addition, Levine did not treat Kruppenbacher until 2004 (R. at 838), and his opinion was

based solely on his interaction with the patient over eleven visits between 2004 and 2005, more than ten years after his date of last insurance. The ALJ was well within his provenance to accord greater weight to Satloff's opinion, which was "based on a broad review of the evidence in the record." (R. at 646.)

        D. Failure to Properly Assess Kruppenbacher's Credibility

"It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y of Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984); accord Tablas v. Apfel, 98 Civ. 5430 (RJB), 2000 WL 423914, at *6 (S.D.N.Y. Mar. 21, 2000). The ALJ devoted significant discussion to Kruppenbacher's credibility and noted several inconsistencies. Although Plaintiff stopped working in 1990 or 1991, allegedly because of his disability, he did not seek treatment until 1995. The ALJ found this questionable in light of Nash's testimony that persons suffering from Meniere's disease generally seek medical treatment immediately. The ALJ also noted that Kruppenbacher performed roofing work in 1995, which "would appear to be the worst type of work for an individual experiencing . . . the symptoms of Meniere's . . . ." (R. at 644.) In addition, the ALJ noted "serious discrepancies" in Kruppenbacher's report of symptoms to Fontanez. Notably, although Plaintiff began seeing Fontanez in January 1996, he did not complain of dizziness until December 1996, despite several intervening consultations. Accordingly, the ALJ's determination of Kruppenbacher's credibility was supported by substantial evidence.

        E. Failure to Properly Assess Kruppenbacher's RFC

A claimant's RFC is "the most [work a claimant] can still do" despite "physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. §

404.1545(a)(1). "If [a claimant] ha[s] more than one impairment[,] [the SSA] will consider all . . . medically determinable impairments" including "[those] that are not 'severe.'" 20 C.F.R. § 404.1545(a)(2). Kruppenbacher contends for the first time that it was error for the ALJ to disregard Satloff's testimony that Kruppenbacher should be precluded from repetitive tasks in assessing his RFC. However, because this argument was not presented to the Magistrate Judge, it is untimely.

    F. <u>Errors in Questioning the Vocational Witness</u>

Lastly, Kruppenbacher argues that the ALJ should have posed certain inquiries to the vocational expert, such as comparing the mental demands of work as a hand packager to Kruppenbacher's IQ and difficulty remembering instructions. Because this argument was not presented to the Magistrate Judge, it is also untimely.

In addition, Kruppenbacher argues that the ALJ erred in finding that he could perform his past relevant work as a hand packager because that job would require him to work under close supervision. However, there is no evidence in the record that Kruppenbacher is unable to tolerate <u>any</u> level of supervision. Rather, the evidence indicates that he can work in an environment where there is "no adversarial relationship between the supervisors and the Claimant . . . ." (R. at 955.) The ALJ incorporated this into the RFC through the requirement that Plaintiff not be under close supervision. Accordingly, the Magistrate's determination on this point was not error.

Finally, Kruppenbacher argues that the ALJ failed to inquire into conflicts between the vocational expert testimony and the Dictionary of Occupational Titles. Plaintiff asserts that the vocational expert did not respond to the ALJ's question regarding "adversarial relationship[s] with supervisors or co-workers." However, when the ALJ re-framed his question,

he <u>did</u> get a response from the vocational expert, which was taken into account in determining whether Kruppenbacher could perform the work of a hand packager. Accordingly, there was no error.

This Court has reviewed the remainder of the Report and finds it is not facially erroneous.

## CONCLUSION

For the foregoing reasons, this Court adopts the Report and Recommendation of Magistrate Judge Henry B. Pitman in full. The Defendant's motion for judgment on the pleadings is granted. The Clerk of the Court is directed to terminate all pending motions and mark the case closed.

Dated: February 14, 2011
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record*

Irwin Milton Portnoy
Irwin M. Portnoy and Associates, P.C.
542 Union Avenue
New Windsor, NY 12553
*Counsel for Plaintiff*

Leslie A. Ramirez-Fisher
United States Attorney's Office
Southern District of New York
86 Chambers Street
3rd Floor
New York, NY 10007
*Counsel for Defendants*